**CHICAGO ROCK ISLAND AND PACIFIC RAILROAD COMPANY, a corporation, Plaintiff and Counterdefendant,**

v.

**CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a corporation, Defendant and Counterplaintiff.**

**HARRIS TRUST AND SAVINGS BANK, a corporation, Plaintiff,**

v.

**CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a corporation, Defendant.**

**Nos. 66 C 1726, 1730.**

United States District Court
N. D. Illinois, E. D.

July 15, 1969.

Charles M. Rush, of Kirkland, Ellis, Hodson, Chaffetz & Masters, O. L. Houts, Gen. Atty., Chicago Rock Island and Pacific Railroad Co., Chicago, Ill., for plaintiffs Chicago, Rock Island and Pacific Railroad Co. and Harris Trust and Savings Bank.

Douglas C. Moir, of Winston, Strawn, Smith & Patterson, Eldon Martin, Gen. Counsel, and Theodore G. Schuster, Gen. Atty., Chicago, Burlington & Quincy Railroad Co., Chicago, Ill., for defendant Chicago, Burlington & Quincy Railroad Co.

## MEMORANDUM AND ORDER

ROBSON, District Judge.

The plaintiffs have sued the defendant for damages arising out of a train disaster. The defendant counterclaimed for a declaratory judgment that an agreement between the parties placed the loss on the plaintiff railroad. After briefs were submitted on certain legal issues, a hearing was held. Post-hearing briefs were filed, and the court took the case under advisement. For the reasons set forth below, this court is of the opinion that judgment should be rendered for the defendant.

On September 25, 1964, the plaintiff [1] Chicago, Rock Island and Pacific Railroad Company ("Rock Island") was unable to use its own tracks to Chicago, because of a defective bridge at Joliet, Illinois. Under a long-standing prior agreement, standardized for the railroad industry, the Rock Island detoured its trains over the defendant Chicago, Burlington & Quincy Railroad Company's ("Burlington") Streator Branch tracks,

---

1. Harris Trust and Savings Bank is also a plaintiff, by virtue of its ownership of one of the demolished Rock Island locomotives. Since the Bank's rights depend on the Rock Island's rights, the singular "plaintiff" will also include the Bank.

which connected with the Burlington's line at Ottawa, Illinois.

The Burlington, at this time, was in the process of completing a change-over, in its system of switching, from manual and mechanical power to electrical power. At the Montgomery Interlocking Station, electrical motors had been installed to replace the mechanical moving of the switches, but the complete change-over to remote control had not been finished, since the levers still had to be operated manually. The Streator Branch of the Burlington connected with Burlington's main tracks by means of Switches 12 and 14, located about 0.2 miles from the Montgomery Interlocking Station. For a train traveling east to Chicago to pass from the Streator Branch onto Track No. 2, Switch No. 14 had to be in "Reverse" position. Inside the Montgomery Station, this was indicated on a board by a red light under the letter "R" for "Reverse." For a train traveling west from Chicago to travel straight through on Track No. 2 without passing onto the Streator Branch tracks, Switch No. 14 had to be in "Normal" position, indicated by a white light under the letter "N" inside the Montgomery Station. There was a locking lever for each switch, and, before a train could be given a signal to proceed in a certain direction, the locking lever had to be pulled. Although it is stipulated that the Burlington did not know at the time, it was possible to give a "proceed" signal without Switch No. 14 being in the desired position. The electrical motors took from 2.2 to 2.6 seconds to begin the actual moving of the switch. If the locking lever was pulled during this period, the switch would remain in its original position, and allow the erroneous "proceed" signal to be given. If the locking lever was engaged *after* this short period, the "proceed" signal could not be given if the switch was still in the original undesired position.

At about 8:45 p. m. on September 27, 1964, Rock Island Train No. 4 eastbound to Chicago from New Mexico and Iowa,

left Ottawa, Illinois, and entered the Burlington's Streator Branch tracks. At this time, Switch No. 14 was in "Reverse" position to allow Rock Island Train No. 4 to travel to Chicago from the Streator Branch to the main Track No. 2. Both signal bridges, east and west, indicated that any trains on Tracks Nos. 1, 2 or the Streator Branch tracks should stop. At about 10:15, the situation was still the same: Switch No. 14 in "Reverse" with the red light on in the Montgomery Station, and both signal bridges indicating "Stop."

When Rock Island Train No. 4 did not appear at the scheduled time, the operator in the Montgomery station was instructed by the Burlington dispatcher's office in Aurora to place Switch No. 14 in the "Normal" position to allow Burlington Train No. 3 to proceed westward straight through on Track No. 2. This was at about 10:40 p. m. This operator pulled the levers for Switch No. 14, locked it, and was able to give a "proceed" signal going west on Track No. 2. He then left to observe the passing Burlington train for hot boxes, sticking brakes, and anything which might have been dragging. However, Switch No. 14 had not moved from its original "Reverse" position, and the red light was still on in the Montgomery station. Apparently, the operator in his rush to get outside to watch the passing train (part of his duties), did not notice the red light. It seems that he had pulled the locking lever within the 2.2 or 2.6 second period mentioned above, and was therefore able to pull the lever which gave the "proceed" signal for westward movements on Track No. 2.

Rock Island Train No. 4 arrived on the Streator Branch at about 10:45 p. m., and since the "stop" signal was still in effect for eastward movements, Train No. 4 stopped a few hundred feet short of the signal bridge. The Burlington Train No. 3, after being given the "proceed" signal (to move at unrestricted speed), was moving westward on Track No. 2 at about 62 miles per hour as it approached the Montgomery Station and

Switch No. 14. The engineer saw that Switch No. 14 was in a reverse position and shortly before reaching it, slammed on the emergency braking system. It was not enough. The Burlington train collided headon at 52 miles per hour with the waiting Rock Island train. Four railroad employees lost their lives, and 215 persons were injured. The property damage was well over one million dollars, including the destruction of two Rock Island and two Burlington locomotives. On January 10, 1958, the Rock Island and the Burlington entered into the Standard Form for Detour Agreement. Exhibit F, Stipulation of Facts. This is an Association of American Railroads (AAR) form, adopted in 1905. In Paragraph 4, in dispute here, the Rock Island agreed with the Burlington to be liable without regard to fault for almost every loss that might occur while the Rock Island was detouring on Burlington's track. This lengthy reciprocal agreement provides:

> "The Home Company [Burlington] shall not be held liable for or on account of *any* loss, damage, or delay, to the trains, engines, cars or other property of *any* kind of *either* company, nor to freight, baggage or other property of *any* kind carried in or upon such trains, engines or cars, nor for or on account of *any* injury to or death of passengers or employes of *either* company, or for or on account of *any* injury to the person or property of *any* other individual or individuals, company or companies, corporation or corporations *whatsoever*, which may be incurred or sustained by reason of such trains being detoured, or by reason of such trains being delayed in such detouring, in *whatever* manner the same may be caused or occasioned, *whether by or through the negligence of the Home Company [Burlington], its agents or servants, or by reason of defects in tracks, structures or facilities furnished by the Home Company, or otherwise,* it being understood and agreed that *all* risk of such delays, loss, damage, injury and death shall be and is hereby assumed by the Foreign Company [Rock Island], and the Foreign Company shall and will hold *harmless* the Home Company from and against *all* liabilities or claims for *all* such delay, loss, damage, injury and death, and shall and will execute and deliver \* \* \* to the Home Company, upon request, a full and complete release, satisfaction and discharge of *all* claims therefor, and will pay \* \* \* *all* costs and expenses incurred by *either* Company in the clearing of wrecks and repairs to equipment, track and property in which by reason of detour movements covered by this agreement the *engines, trains or cars of the Foreign Company [Rock Island] are concerned, expenses and attorney's fees* incurred in defending any action which may be brought against the Home Company on account of *any* such claim or liability and *any* judgment which may be rendered against the Home Company on account thereof. The Foreign Company shall pay all fines, penalties, costs and expenses imposed upon or incurred by the Home Company by reason of any violation by the Foreign Company of the Safety Appliance or other State or Federal Laws, and hold the Home Company harmless therefrom." (Emphasis added)

For the purposes of argument, the Burlington admits that it committed a violation (though unwittingly) of the Safety Appliance Acts.[2] However, the Burlington claims that this Detour Agreement covers the conduct involved in this disaster, and that, therefore, the Rock Island must pay all the losses, which are stipulated to be $563,699.17 for the Rock Island and the Bank, and $786,718.62 for the Burlington, plus attorney's fees and

---

**2.** The Burlington pleaded *nolo contendere* to a civil charge of a violation of the Federal Safety Appliance Acts. United States v. Chicago, Burlington & Quincy Railroad Co., 65 C 1191 (N.D.Ill. October 28, 1965), 49 U.S.C. § 26(e); 49 C.F.R. §§ 136.303 and 136.307. Without admitting a violation, "in order to avoid the time and expense of litigation," the Burlington paid the $100 penalty.

costs. The parties also agreed that the party held responsible here will defend and be responsible for all pending suits. The Rock Island argues that the Detour Agreement does not cover a violation of the Safety Appliance Acts, and that, if it does cover such a violation, it is void as a violation of public policy.

■ Jurisdiction of the court is founded on 49 U.S.C. § 8, which provides that if a carrier subject to the Interstate Commerce Act does anything in violation of that Act, "such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation * * * together with a reasonable counsel or attorney's fee * * *." The Burlington contends that the history and practice under the Interstate Commerce Act show that this federal cause of action is limited to living persons, whose lives and limbs are put in jeopardy by a violation of the Safety Appliance Acts, and has never been extended to corporations. However, this overlooks the definition in 49 U.S.C. § 1(3) (a) that the "term 'person' as used in this chapter includes an individual, firm, copartnership, corporation, company, association, or joint-stock association; and includes a trustee, receiver, assignee, or personal representative thereof." Faced with this explicit inclusion of corporations into Section 8 by virtue of Section 1(3) (a), and the undisputed allegation of an injury because of an alleged violation of the Safety Appliance Acts, this court is of the opinion that jurisdiction is proper.

## COVERAGE OF THE DETOUR AGREEMENT

■ The Detour Agreement, quoted above, could not contain more words denoting a desire to include virtually every kind of loss that might occur while the Rock Island was operating on the Burlington's tracks. Apparently because most cases relating to the agreement have been submitted to arbitration or settled, Paragraph 7, Exhibit F, Stipulation of Facts, research reveals only one

case which has construed the Detour Agreement. Alabama Great Southern Railroad Co. v. Louisville and Nashville Railroad Co., 127 F.Supp. 363 (N.D.Ala. 1955), reversed on other grounds 224 F. 2d 1, 50 A.L.R.2d 1302 (5th Cir. 1955). The court, at 368, noted this fact:

"Strikingly noteworthy of comment is that for nearly fifty years the railroads have been content to solve the problems arising under similar agreements without resorting to the courts for their construction or application."

The court held that there was no need to prove that the Foreign Road proximately caused the injury. The court said, at 370:

"[I]t would seem that the clause, 'by reason of such trains being detoured,' serves the function only of eliminating from the indemnity provisions those losses and damages in which the detouring train had no part whatsoever."

In reaching this conclusion, the court took into account the factor that this contract was

"entered into between two corporations moving in an area of comparative economic equality, dealing with the familiar transaction of their everyday concerns, couched in the terse language of businessmen, intended to apply to an almost infinite variety of prospective and undetermined events, [and] the contract should be read, not with the thought of measuring it by the precision of legalistic niceties, but with an eye single to discerning the intentions of the parties." *Id.*, at 369–370.

Although the court held that the words "or otherwise" are not to be construed as a catchall for every type of conduct, and that the term "negligence" did not include "wilful and wanton" negligence, the court generally gave the contract broad effect.

In holding that the contract did not violate public policy (excluding wilful

and wanton conduct), the court said, at 371:

"Enough has been written to indicate the view of the court that the indemnity and exemption provisions of the detour agreement, limited by the foregoing construction to losses and damages resulting from simple negligence, are inoffensive to public policy. Generally, cases cited by the defendant as holding to the contrary may be distinguished. Most of them relate to arrangements that would deprive a member of the public, situated at an economic disadvantage, of relief from damages caused by the simple negligence of a party required by the public interest to accept responsibility."

The Court of Appeals for the Fifth Circuit, in affirming this construction, said (224 F.2d, at 4) that they were

"in general agreement with [the lower court's] expressed view that the detour agreement was valid and effective as to all losses and damages caused and occasioned by negligence or otherwise, except that its terms did not extend to or include wanton negligence or willful acts and that, if they did, the agreement would, to that extent, be illegal and unenforceable."

The Rock Island contends that, since the Federal Safety Appliance Acts impose absolute liability for violations, the term "negligence" in the Detour Agreement does not include violations of the Federal Safety Appliance Acts.

The Seventh Circuit Court of Appeals has held that violations of the Safety Appliance Acts are "negligence per se," which is merely another way of saying "absolute" or "strict" liability. Chicago, Milwaukee, St. Paul and Pacific Railroad Co. v. Alva Coal Corporation, 365 F.2d 49, 54 (7th Cir. 1966), and cases cited therein. The Alva case dealt with a so-called "sidetrack" agreement made between a railroad and another company (usually a shipper) for the transfer of railroad cars from the main tracks to a side track under the control of the shipper. The Rock Island argues that this is a sufficient distinction between the Alva case and the present case. However, the court was concerned in Alva not only with the effect of the facts, but the construction of an agreement which used the term "negligence" in a similar manner as it is used in the instant Detour Agreement. The court held that the term "negligence" included the concept of "negligence per se" or absolute liability. To this court, the distinctions do not make a substantial difference in defining the same term in the Detour Agreement. It therefore appears that the conduct, which would ordinarily be no more than simple negligence (and clearly not wilful or wanton conduct), though classed by statute under the concept of absolute liability, is covered by the Detour Agreement.

In addition, the next phrase, using the disjunctive "or," that all losses are indemnified by the Foreign Company which arise from "defects in tracks, structures, or facilities furnished by the Home Company, or otherwise * * *," clearly covers the conduct in this case. The testimony revealed that one wire, costing a few pennies, could have averted the disaster. But the testimony also revealed that the structures operated efficiently for 40 years, and the need for the addition of the wire could not have been determined from a study of the electrical diagrams. The lack of this wire was certainly a "defect" in terms of the Detour Agreement. The Rock Island contends that, for there to be a defect, there must be an existing structure for there to be a defect in, and since there was no wire, there could be no defect. This is, however, a mere game of semantics. The structure that was defective was the switching mechanism and it was the very lack of the wire which made it defective. Websters New International Dictionary (2d Edition 1953) defines "defect" as a "[w]ant or absence of something necessary for completeness or perfection; deficiency." That the switching mechanism was not complete or perfect is beyond question. The agreement under this clause covers the conduct in question.

The Rock Island further argues that the second sentence shows that the Burlington should be held liable. The second sentence, added in 1913, says that the Foreign Company (Rock Island here) is liable for all the fines, penalties, costs and expenses as a result of violations of the Safety Appliance Acts. The Rock Island argues that this means that each company was to bear its own expenses, etc., whenever a Safety Appliance Act violation occurred, and that, therefore, the Burlington should be liable for the present claims. This interpretation might be acceptable if this second sentence stood alone. The first sentence, however, does not mention fines and penalties, and this second sentence was added to cover such statutory fines and penalties incurred by the Foreign Company, and is silent as to the Home Company's obligations. The fact that the Burlington entered a *nolo* plea, thereby not admitting liability, and paid the $100 penalty "to avoid the costs of litigation," does not mean that the Burlington was acting on the interpretation of the agreement that the Rock Island suggests. However, extrinsic evidence cannot be introduced except to show the lack of a contract, to clarify an ambiguity, or to demonstrate a custom or practice. *E.g.*, Hammer v. Sanders, 8 Ill.2d 414, 134 N.E.2d 509 (1956), cited in Pennsylvania Railroad Co. v. Indiana Harbor Belt Railroad Co., 159 F.Supp. 19, 25 (N.D.Ill. 1958). The plaintiff admits that the contract is valid insofar as "simple" negligence is concerned. This court has held that the contract is not ambiguous insofar as its application to the conduct here in question, and the Rock Island has not submitted any evidence that would support a finding of a custom and practice. The construction urged by the plaintiff is not therefore a practical interpretation, given the sweeping language in the second sentence, and the lack of any explicit mention of the Home Company's violations.

## PUBLIC POLICY

■■ In a case involving the negligence of an employee of one of the parties (in lowering a crossing gate onto the back of a passenger on a motorcycle waiting for the train to pass), without the broad language in the Detour Agreement to fall back on, the court said there is no "public policy [which] forbids the plaintiff from shifting the risk of loss from its own negligence or that of its employees onto the defendant by mutual assent." Pennsylvania Railroad Co. v. Indiana Harbor Belt Railroad Co., supra, at 24. It is true, though, that a contract will not be construed to indemnify a party against his own misconduct unless the language of the agreement clearly warrants it. *E.g.*, Halverson v. Campbell Soup Co., 374 F.2d 810, 813 (7th Cir. 1967). As discussed above, the Detour Agreement does clearly indemnify the Burlington for losses such as it has sustained here. Although the contract says that the Burlington "shall not be held liable," this court cannot read this clause to mean that the Burlington is wholly "exonerated" from liability. The Burlington is liable, but, by virtue of this agreement, the Rock Island has agreed to indemnify the Burlington for the losses resulting from the crash. If, by some chance, the Rock Island were in bankruptcy, or otherwise unable to pay, public policy would require a construction of the agreement which would demand that the Burlington assume the obligation to pay for such losses. Since "it is common knowledge that the device of insuring against one's own negligence through indemnity contracts is frequently employed in * * * business ventures" outside of the insurance industry, a contract, such as this one which was entered into by two parties of "equal bargaining power" on a form prepared by the members of the railroad industry and operating for over 50 years, shows that public policy is not offended by such indemnification. *E.g.*, Jacksonville Terminal Co. v. Railway Express Agency, Inc., 296 F.2d 256, 262–263 (5th Cir. 1962).

■ If the Agreement left members of the public, passengers, or other individuals for whose benefit the Safety

Acts were passed without any remedy, then there might be a violation of public policy. *Cf.* Pennsylvania Railroad Co. v. Indiana Harbor Belt Railroad Co., *supra*; Boyer v. Atchison, Topeka and Santa Fe Railway Co., 38 Ill.2d 31, 230 N.E.2d 173 (1967). Here, however, the public will be protected, since either the defendant or the plaintiff will have to pay any valid claims resulting from the disaster. The fact that, in sustaining jurisdiction, this court has included the Rock Island under the language of 49 U.S.C. § 8 as one of the persons protected under the Federal Safety Appliance Acts, does not alter this conclusion. While it may be true that the Rock Island has certain rights under the Safety Acts, it is equally true that it has bargained them away to a large extent in the Detour Agreement. In consideration for this, the Rock Island (and practically every other railroad in the United States) may impose the same indemnification obligation on the Burlington should the Burlington ever have to detour over the Rock Island's tracks.

The Rock Island further argues that by allowing this agreement to take effect as written, violations of the Federal Safety Appliance Acts are thereby encouraged. If the plaintiff were correct, all insurance or quasi-insurance contracts which provide for payment in the event of injury as a result of the negligence or wrongful conduct (not of course wilful or wanton conduct) of the indemnitee, would be held invalid as violative of public policy. Such contracts are not, however, violative of public policy. *E.g.,* Colorado Milling and Elevator Co. v. Terminal Railroad Association of St. Louis, 350 F.2d 273, 278 (8th Cir. 1965); Ryan Mercantile Co. v. Great Northern Railway Co., 294 F.2d 629, 634–636 (9th Cir. 1961); Alabama Great Southern Railroad Co. v. Louisville and Nashville Railroad Co., *supra*. In addition, the severe consequences that might arise from a violation of the Safety Appliance Acts still act as a deterrent for future violations. In this case, a defect undiscovered for 40 years, to use the defendant's words, "exploded like a World War I mine." When it was going to "explode" could not have been foreseen. It did explode at a time when, by virtue of contract, one of the Rock Island trains was involved and was an indemnitor of the consequent damage. It could have happened when two of the Burlington trains were in similar positions. This possibility would be deterrent enough to someone who was in a position to alter the situation. The Burlington, it is stipulated, did not know and could not have corrected for the fault or defect beforehand. The plaintiff has not presented sufficient evidence to make out a case of wilful and wanton conduct, which would be necessary to declare the contract void as violating public policy.

As stated heretofore, the contract provides for final and binding arbitration of all situations relating to the detouring of trains. However, it is this court's opinion that the plaintiff has abandoned its claim for arbitration, as a matter of law. Alabama Great Southern Railroad Co. v. Louisville and Nashville Railroad Co., 224 F.2d 1, 4–5 (5th Cir. 1955).

It is therefore ordered that judgment be rendered for the defendant Chicago, Burlington & Quincy Railroad Company in the amount of $786,718.62, plus costs and reasonable attorney's fees.