CHICAGO AND NORTH WESTERN
TRANSPORTATION COMPANY,
Plaintiff-Appellee,

v.

The ATCHISON, TOPEKA, AND SANTA
FE RAILWAY COMPANY,
Defendant-Appellant.

No. 78–1952.

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1979.

Decided Nov. 13, 1979.

Christopher A. Mills, Chicago, Ill., for defendant-appellant.

John C. Palmer, Jr., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, WOOD, Circuit Judge, and SOLOMON, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

The appellant, the Atchison, Topeka, and Santa Fe Railway Company (Santa Fe), appeals to this court from the district court's judgment against it in the amount of $108,-895.42 on the claim of the appellee, Chicago and North Western Transportation Company (C&NW). Santa Fe also appeals from the district court's dismissal of its counterclaim against C&NW. We hold that C&NW's claim was barred by the statute of limitations and therefore reverse the judgment on the main claim and direct entry of judgment in favor of Santa Fe. We also hold that the trial court erred in dismissing the counterclaim and therefore reverse the judgment of dismissal and remand for further proceedings.

Both of the parties to this action are common carriers by railroad and both are subject to the duty imposed by Part I of the Interstate Commerce Act, 49 U.S.C. §§ 1–27,[1] to "provide and furnish transportation upon reasonable request therefor." *Id.* § 1(4) (now codified at 49 U.S.C. § 11101(a)). "Transportation" is defined in the Act to include the "ventilation, refrigeration or icing" necessary to protect property—typical-

---

* The Honorable Gus J. Solomon, Senior District Judge of the United States District Court for the District of Oregon, is sitting by designation.

1. The Interstate Commerce Act was codified recently by Pub.L.No.95–473, 92 Stat. 1337 (1978). Citations in this opinion are to the original Title 49 with parenthetical notation of the recent codification. The legislative history makes it plain that the revision was not intended to work any substantive change. *See* H.Rep.No.95–1395, 95th Cong., 2d Sess. 1, 4, 9–10, *reprinted in* [1978] U.S.Code Cong. & Admin.News pp. 3009, 3013, 3018.

ly perishable produce—during shipment. *Id.* § 1(3)(a) (now codified at 49 U.S.C. § 10102(23)(B)). Both C&NW's claim and Santa Fe's counterclaim concern the proper division between railroads of the cost of providing protective service against heat or cold when each railroad has participated in either the movement of perishable commodities or the provision of protective service.[2]

In the past perishable commodities were protected against heat or cold by the use of ice and salt in bunker ice cars. On long-haul shipments, ice bunkers would have to be replenished en route and often after reaching the shipment's destination prior to delivery. Thus, in a shipment over the rails of several carriers, each railroad had an obligation under the tariffs to ice the cars as necessary. C&NW's claim stems from the costs it incurred in providing this service to cars delivered by Santa Fe to C&NW's Wood Street Terminal in Chicago.

The advent in 1953 of mechanical refrigerator cars led to a gradual reduction and early in the 1970's the complete discontinuance of the use of bunker ice cars. Today virtually all perishable commodities are shipped in mechanical refrigerator cars and protected from heat or cold by mechanical refrigeration units. *See Icing Services, U. S. Railroads,* 343 I.C.C. 67, 72 (1973) (permitting railroads to discontinue icing services and remarking "[c]learly ice refrigeration in railcars is obsolete and should be replaced by mechanical protective service"). The modern refrigerator cars eliminate the need for continual icing and reicing. Most of the servicing of the mechanical refrigeration units can be accomplished by the originating carrier or the car owner without the need for extensive services in intermediate and destination areas. Santa Fe's counterclaim finds its origin in C&NW's use over its tracks of mechanical refrigeration cars owned by Santa Fe.

### I. C&NW's Claim

C&NW initiated this action against Santa Fe in 1973 to recover its costs for icing services it provided to cars delivered at its Wood Street Terminal by Santa Fe between 1965 and 1969. C&NW's claim rested on its interpretation of the National Perishable Freight Committee's Division Sheet 7. C&NW's complaint alleged and Santa Fe's answer conceded that the division sheet was a valid and binding agreement between the rail carriers. Santa Fe, however, interpreted the division sheet differently than C&NW and insisted that the payments which it had already made to C&NW satisfied in full its obligation under that document to pay C&NW for its icing services. Santa Fe's answer also interposed the statute of limitations as a defense to the action.

C&NW's complaint posited the subject matter jurisdiction of the district court upon 28 U.S.C. §§ 1331 and 1337, claiming that the action arose out of Part I of the Interstate Commerce Act, 49 U.S.C. §§ 1–27. Santa Fe did not contest the court's jurisdiction. The pleadings affirmatively show that diversity between the parties is absent: both corporations were at the time of the filing of the complaint incorporated in Delaware and each had its principal place of business in Illinois. We raise the issue of the subject matter jurisdiction of the federal courts over this controversy *sua sponte.*

■■■ The division sheet upon which C&NW predicates its claim is a nationwide contract to which many railroads have agreed to be parties. Its function is to divide equitably and fairly among the various railroads furnishing transportation services the tariff revenues collected from shippers. The federal interest in regulating the division of revenues derived from such services is manifest in the provisions of the Interstate Commerce Act. 49 U.S.C. § 15(6) (now codified at 49 U.S.C. § 10705) grants the Interstate Commerce Commis-

---

**2.** Shippers of perishable commodities requiring protective service against heat or cold are subject to a separate charge for such service at rates specified in the Perishable Protective Tariffs. "The railroads hold themselves out to furnish such service and publish tariffs of charges therefor, and the shippers pay those charges to the railroads." *Contracts for Protective Services,* 318 I.C.C. 111, 112 (1962). No claim has been made by either railroad that it is entitled to a greater charge against the shipping public than has already been collected.

sion the power to prescribe divisions of joint rates, fares and charges if it finds existing divisions to be "unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers." The Supreme Court has noted the federal interest in regulating divisions is "one aspect of the general rate policy which Congress has directed the Commission to establish and administer in the public interest." *ICC v. Hoboken Manufacturers' R. R.,* 320 U.S. 368, 381, 64 S.Ct. 159, 166, 88 L.Ed. 107 (1943). *See also The New England Divisions Case,* 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605 (1923).

The Interstate Commerce Act leaves divisions of revenue in the first instance to the agreement of carriers, but it nevertheless imposes upon carriers the duty to agree on just divisions. 49 U.S.C. § 1(4) (now codified at 49 U.S.C. § 10701(a)) provides: "It shall be the duty of every . . . common carrier . . . in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers." Division Sheet, 7 was agreed to by the parties here pursuant to that duty, and C&NW's suit is designed to compel Santa Fe to completely perform that duty:

> The duty to "establish" the just divisions can not be construed as limited to merely signing writings concerning them. As used in the text, the duty to "establish just divisions" meant to originate, agree upon and apply such divisions in conducting the business to which the statutory regulation applies. As stated by the Supreme Court in *Alton Railroad Co. v. United States,* 287 U.S. 229, loc. cit. 235–236, 53 S.Ct. 124, 126, 77 L.Ed. 275, "each carrier is entitled as of right to the divisions * * * agreed upon", and the duty to make the division according to law derives directly from the Interstate Commerce Act.

*Thompson v. St. Louis-San Francisco Ry.,* 218 F.2d 166, 171 (8th Cir. 1954), *cert. denied,* 348 U.S. 964, 75 S.Ct. 525, 99 L.Ed. 752 (1955).

49 U.S.C. § 8 (now codified at 49 U.S.C. § 11705(b)(2)) provides in pertinent part:

> In case any common carrier subject to the provisions of this chapter . . . shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person . . . injured thereby for the full amount of damages sustained . . . .

Moreover, 49 U.S.C. § 9 (now codified at 49 U.S.C. § 11705(c)(1)) provides:

> Any person . . . claiming to be damaged by any common carrier subject to the provisions of this chapter . . . may bring suit in his . . . own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter in any district court of the United States of competent jurisdiction . . . . .

The substantial federal interest in the subject matter of this suit, *see also* 49 U.S.C. § 10101(a)(3) (codifying the national transportation policy "to encourage . . . sound economic conditions among carriers"), plus the carrier's duty imposed by section 1(4) of the Interstate Commerce Act effectively distinguish this case from those decisions holding that a suit to enforce an agreement between private parties does not arise under federal law "merely because the agreement was authorized by federal law or some federal agency has approved the agreement." 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3562 at 410 (1975). *Accord, Local Division 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility,* 585 F.2d 1340 (7th Cir. 1978) (an action to enforce contract provisions mandated by federal statute arises under federal law).

C&NW claims the source of its obligation to provide icing services in applicable tariffs, and, although its claim is based on the division sheet, ascertaining the meaning of such a sheet frequently requires resort to coordinate tariffs. An action under the tariffs unquestionably arises under federal law, *see Madler v. Artoe,* 494 F.2d 323 (7th Cir. 1974), and we see no reason why this action under the division sheets should be

treated differently. As the court in *Thompson v. St. Louis-San Francisco Ry.,* 218 F.2d at 172, remarked:

> Although Division Sheets . . . are not strictly tariff sheets or published as such, substantially the same grounds of federal jurisdiction are present in respect to a suit to recover a part of a division for interstate transportation under the Division Sheets as over a suit to recover sums due from a shipper under a published tariff.

We hold that C&NW's complaint properly invoked the jurisdiction of the federal court under 28 U.S.C. § 1337.

■ Santa Fe in its answer maintained that 49 U.S.C. § 16(3)(a) (now codified at 49 U.S.C. § 11706(a)) barred C&NW's action to recover its icing costs. Section 16(3)(a) provides:

> All actions at law by carriers subject to this chapter for recovery of their charges or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after.

The district court ruled the provision inapplicable and, applying the relevant Illinois statute of limitations, held that the action was timely commenced. Although most of what little authority there is tends to support the district court's view, *see* Annot., 18 A.L.R.Fed. 640, 648–49 (1974), we construe section 16(3) more broadly and hold that it bars C&NW's recovery.

C&NW argues that section 16(3) applies only in actions between carriers and shippers and not in actions between carriers only. This interpretation of the statute of limitations finds its origin in a district court opinion in *Atlantic Coast Line R.R. v. Baltimore & Ohio R.R.,* 12 F.Supp. 711 (D.Md. 1935). The court's discussion in that case was unnecessary to its decision and gave little reasoning to support its conclusion. Consequently, were *Atlantic Coast Line* the only existing gloss on section 16(3), our reading of the plain language of the section would lead us to reject it as unpersuasive. The Eighth Circuit, however, later adopted the *Atlantic Coast Line* court's interpretation of the statute of limitations as encompassing only suits between carriers and shippers in *Thompson v. St. Louis-San Francisco Ry.,* 218 F.2d 166 (8th Cir. 1954), *cert. denied,* 348 U.S. 964, 75 S.Ct. 525, 99 L.Ed. 752 (1955).

The reason for the Eighth Circuit's adoption of the *Atlantic Coast Line* court's interpretation is unclear. The lead opinion of the court merely quoted from *Atlantic Coast Line* and relied upon "acceptance" by the railroads and acquiescence of the ICC. 218 F.2d at 172 (opinion of Woodrough, J.). Another member of the court dissented on the merits and merely expressed his opinion that the action was not time-barred. *See id.* at 174 (Sanborn, J., dissenting). The third member of the court, Judge Johnsen, concurred "for the sake of unanimity," but expressed his doubt about the extent of reliance by the railroad industry and stated what we believe is the sounder view of the meaning of section 16(3)(a):

> I can see no reason on the statute to believe that, when Congress deemed it advisable, in the interest of uniformity and certainty, to impose a limitation on "All actions at law by carriers * * * for recovery of their charges, or any part thereof", it was in any way concerned about or intending to have regard for any theories, forms, technicalities and distinctions in common law actions or recoveries. I think it was fixing a time, as a general transportation-code policy, within which a carrier had to act to recover its transportation charges or revenues against anyone who owed it the duty of making payment thereof as such. And certainly what is here being recovered is in fact transportation charges or revenues.

*Id.* at 173.

Although we have found *Thompson* persuasive on the jurisdictional issue, we part company with the Eighth Circuit on the limitations issue. We instead agree with the reasoning of, but not the result reached by the concurring opinion and hold that the limitation on actions established in section 16(3) governs not only actions under the Act between shippers and carriers, but also

those, such as this one, between carriers. The language of section 16(3)(a) literally applies to the present action. It bars "[a]ll actions at law by carriers" brought for the recovery of charges more than three years after the accrual of the cause of action. (Emphasis added.) The courts in *Atlantic Coast Line* and *Thompson* disregarded the clear language of the section apparently because of what they regarded as a narrower congressional objective in enacting the limitation: to regulate and provide for uniform charges in carrier-shipper transactions. Although it is true, as C&NW has argued, that a primary purpose of the Interstate Commerce Act is to ensure equal treatment of all shippers, the Act, as we have discussed above, also provides for the regulation of inter-carrier relations as a part of its general rate policy. Given the broad literal scope of section 16(3)(a), the federal regulatory interest in inter-carrier divisions, and the basic policy of uniformity and equality underlying the statute of limitations, we hold that section 16(3)(a) applies in actions between carriers as well as those between shippers and carriers. Because C&NW's action was commenced more than three years after the last icing services for which its complaint seeks recovery, the action is time-barred by 49 U.S.C. § 16(3)(a).

■■ Our conclusion is bolstered by the opinion of the Interstate Commerce Commission in *In re Investigation into Lawful-ness of Interchange Arrangements Between Bangor & Aroostook Railroad and CP Rail,* 356 I.C.C. 749 (1977), *aff'd on other grounds sub nom. Bangor & Aroostook R.R. v. ICC,* 574 F.2d 1096 (1st Cir.), *cert. denied,* 439 U.S. 837, 98 S.Ct. 121, 58 L.Ed.2d 133 (1978), decided after the district court's dismissal of Santa Fe's statute of limitations defense. There the Commission held that section 16(3)(b) applies to claims between carriers as well as those between carriers and shippers.[3] The Commission criticized the courts' reasoning in *Atlantic Coast Line* and *Thompson* and after a detailed examination of the legislative history of section 16(3) found no basis for the construction previously given to the statute by the courts. 356 I.C.C. at 771–79. It goes without saying that the interpretation given a statute by the agency charged with the principal responsibility for administering it is entitled to considerable deference, *Health Care Service Corp. v. Califano,* 601 F.2d 934, 935–36 (7th Cir. 1979), and the ICC's interpretation of section 16(3) certainly has a reasonable basis in the language of the Act. Although the Commission was construing a different subsection of section 16(3), *see* note 3 *supra,* and its discussion is arguably dictum,[4] the opinion's reasoning is plainly inconsistent with the earlier judicial decisions construing section 16(3)(a). We find the ICC's reasoning persuasive[5] and therefore reverse the judgment entered against Santa Fe and direct entry of judgment in its favor.

---

**3.** Section 16(3)(b) (now codified at 49 U.S.C. § 11706(c)) provides:

All complaints against carriers subject to this chapter for the recovery of damages not based on overcharges shall be filed with the commission within two years from the time the cause of action accrues, and not after

. . . .

Although subsection (b) literally applies only to complaints filed before the Commission, it seems well settled that it would bar actions filed in the courts as well. *See Kansas City Southern Ry. v. Wolf,* 261 U.S. 133, 43 S.Ct. 259, 67 L.Ed. 571 (1923). Therefore, it also would seem to bar C&NW's action against Santa Fe. Indeed, subsection (b) has an even shorter limitation period than subsection (a). Santa Fe's answer, however, only pleaded the longer three-year limitation, and because either period bars C&NW's claim, we need not decide whether Santa Fe could now rely on subsection (b) or whether, as C&NW insists, Santa Fe

waived its right to assert subsection (b) as a bar to this action.

**4.** Although the Commission ruled that section 16(3)(b) applied in actions between carriers, it held on the facts of the case that the conduct of the defendant railroad amounted to fraudulent concealment, thus tolling the running of the statute.

**5.** Parenthetically, we reject the view advanced by the court in *Seaboard Coast Line R.R. v. Long Island R.R.,* 447 F.Supp. 108 (E.D.N.Y. 1978), *aff'd on other grounds,* 595 F.2d 96 (2d Cir. 1979), that invoking the bar of the statute of limitations as recently interpreted by the Commission would somehow involve "retroactive" application of the statute. On the contrary, we, as did the Commission, merely declare the meaning of the statute as it was enacted by Congress.

## II. Santa Fe's Counterclaim

■ Santa Fe's answer to C&NW's complaint set up a counterclaim for losses it allegedly suffered during 1970, 1971, and 1972 as a result of furnishing mechanical protective services to its refrigerator cars which moved over the lines of C&NW. The counterclaim admitted that the parties to the action were also parties to Division Sheet 7 which required C&NW to pay to Santa Fe eighty percent of the mechanical protective service charge it collected from shippers under the Perishable Protective Tariff. The counterclaim also admitted that Santa Fe received from C&NW all amounts due under the division sheet. The counterclaim asserted, however, that 49 C.F.R. § 1032.2 as interpreted by the ICC in *Contracts—Protective Service Between Pacific Fruit Express Company and the Akron, Canton & Youngstown R.R.*, 340 I.C.C. 754 (1972), entitled Santa Fe as a protective service provider to recover the actual cost of providing the service to C&NW.[6]

The district court, per Bauer, J., dismissed the counterclaim on essentially three grounds. *Chicago & North Western Transportation Co. v. Atchison, Topeka & Santa Fe Ry.*, 367 F.Supp. 801 (N.D.Ill.1973). First, the counterclaim was not compulsory and therefore required an independent jurisdictional basis. The court held that the counterclaim lacked a sufficient statement of the grounds upon which the court's jurisdiction depended. Second, the court held that even if subject matter jurisdiction were established, the complaint sought essentially a division of revenues between joint carriers—a matter within the exclusive and primary jurisdiction of the ICC. Finally, the district court held that to the extent that the counterclaim relied on a violation of 49 C.F.R. § 1032.2 it was necessary that the division sheet required ICC approval under 49 U.S.C. § 1(14)(b) (now codified at 49 U.S.C. § 11105). This was not the case, the court reasoned, since section 1(14)(b) applied only to contracts between common carriers and other persons, but not to contracts between two common carriers. Santa Fe subsequently filed an amended counterclaim, which in Count I cured the defect in its jurisdictional statement and realleged essentially the same claim as its original pleading. Count II added a claim in quantum meruit, arising out of the same facts. The district court, this time per Judge Kirkland, dismissed Count I on substantially the last two grounds relied on in Judge Bauer's opinion. Judge Kirkland also noted this court's decision in *Chicago & North Western Transportation Co. v. Chicago, Rock Island & Pacific R.R.*, 504 F.2d 453 (7th Cir. 1974) (*Rock Island*). In *Rock Island* this court interpreted 49 U.S.C. § 1(14)(b) as inapplicable to contracts between common carriers. Count II of Santa Fe's counterclaim was dismissed because a quantum meruit claim presupposes the nonexistence of a valid contract and Santa Fe acknowledged the existence of one—Division Sheet 7.

In this appeal, the parties have largely confined their argument to the issue of whether a common carrier is a "person" within the meaning of 49 U.S.C. § 1(14)(b).

---

6. 49 C.F.R. § 1032.2, which was promulgated by the Commission in *Contracts for Protective Services*, 318 I.C.C. 111 (1962), provides in pertinent part:

(a) All rail carriers and express companies receiving protective services under any contracts, agreements, or arrangements requiring approval under section 1(14)(b) of the Interstate Commerce Act shall submit for approval, on or before 120 days after the effective date of this section, new or superseding contracts covering protective services performed under contracts now on file with the Commission as well as those performed under the provisions of Division Sheet 7, "Basis of Divisions Applying in Con-

nection with Charges for Protective Services As Published in Perishable Protective Tariff 16 or Successive Issues Thereof", and supplements thereto. The contracts required herein to be filed shall supersede all prior contracts, including Division Sheet 7, and such contracts and those filed thereafter shall conform in substance to the provisions set forth in paragraphs (b), (c), (d), (e), (f), and (g) of this section.

(b) The charge for each protective service shall yield to the person performing such service no less than the cost of performing the service, the cost to be determined as set forth in paragraph (d)(1) and (2) of this section.

Santa Fe maintains that this court's opinion in *Rock Island*, which held that section 1(14)(b) did not require ICC approval of agreements between common carriers, was wrongly decided. Santa Fe argues that *Rock Island* is in direct conflict with the decisions of several courts, *Pacific Fruit Express Co. v. Akron, Canton & Youngstown R.R.*, 355 F.Supp. 700 (N.D.Cal.1973), *aff'd*, 524 F.2d 1025 (9th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976); *Southern Ry. v. United States*, 412 F.Supp. 1122 (D.D.C.1976) (three-judge panel) (per Leventhal, Circuit Judge); *Atchison, Topeka & Santa Fe Ry. v. Baltimore & Ohio R.R.*, No. 74–1859 (E.D.Pa. June 22, 1976), and with the rulings of the ICC itself in *Contracts for Protective Services*, 358 I.C.C. 638 (1978) and *Contracts for Protective Services* (Jan. 9, 1979) (denying petition for reconsideration). C&NW, on the other hand, urges us to reaffirm our previous decision and therefore to affirm the dismissal of the counterclaim.

Section 1(14)(b) of the Interstate Commerce Act provides in pertinent part:

> It shall be unlawful for any common carrier by railroad . . . to make or enter into any contract, agreement, or arrangement with any person for the furnishing to or on behalf of such carrier . . . of protective service against heat or cold . . . unless and until such contract, agreement, or arrangement has been submitted to and approved by the Commission as just, reasonable, and consistent with the public interest . . . . .

*Rock Island* was a suit between two common carriers in which the validity of Division Sheet 7 was questioned. This court, affirming the validity of the division sheet, held that a common carrier was not a "person" within the meaning of section 1(14)(b). We relied on basically three grounds in support of our holding. First, we noted that Congress provided separate definitions of "common carrier" and "person" under the Interstate Commerce Act, *see* 49 U.S.C. § 1(3)(a) (now codified at 49 U.S.C. § 10102), and held that the definition of the latter was insufficient to encompass the former. Second, we examined the legislative history of section 1(14)(b). Prior to the enactment of the section, it was of course the duty of every railroad to provide protective services against heat and cold. It was a common practice, however, for railroads to contract much of this work out to railroad-controlled companies over which the ICC had no jurisdiction.[7] This made it difficult for the Commission to determine the railroads' actual costs for providing such service, thereby complicating the Commission's investigations to determine the proper amounts for the services which should be charged to shippers. Section 1(14)(b) was enacted to remedy this problem. Finally, this court noted its conviction that the ICC would adopt the same construction of the section. We noted that *Contracts for Protective Services*, 318 I.C.C. 111 (1962), as well as *Pacific Fruit Express Co. v. Akron, Canton & Youngstown R.R.*, 355 F.Supp. 700 (N.D. Cal.1973), *aff'd*, 524 F.2d 1025 (9th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976), involved disputes between carriers and certain protective service (or carline) companies, not agreements between rail carriers. Although we recognized that in *Contracts for Protective Services*, 278 I.C.C. 531 (1950), an

---

7. These companies are called carline companies. As described by the ICC shortly after the enactment of section 1(14)(b) in *Contracts for Protective Services*, 246 I.C.C. 145, 154–55 (1941):

> A car-line company is "not a carrier by railroad, or, indeed, a common carrier at all" (*Chicago, N. Y. & B. Refrigerator Co. v. Interstate Commerce Commission*, 265 U.S. 292, 296 [, 44 S.Ct. 558, 560, 69 L.Ed. 1024]), but, on the other hand, it does nothing which is not embraced within the duty of a carrier by

> railroad to the public which it serves. It owns and maintains refrigerator cars which the railroads use, and it also performs certain services for railroads in connection with the protection against heat or cold of perishable shipments. It is, in short, an agency which affords a convenient means of pooling a special type of railroad equipment and of furnishing for a group of railroads collectively certain services which require specialized and concentrated attention.

inter-carrier agreement for protective services was submitted to the Commission for approval, we regarded that precedent as unconvincing because the necessity for submitting the inter-carrier agreement for Commission approval had not been raised in that proceeding. We concluded: "We are satisfied that these decisions do not indicate any belief by the Commission that Section 1(14)(b) requires approval of protective service contracts between common carriers." 504 F.2d at 455.

It is now apparent that our surmise about the interpretation that the ICC would place on section 1(14)(b) was wrong. In *Contracts for Protective Services*, decided January 9, 1979, the Commission denied a motion for reconsideration of its earlier decision of July 27, 1978, see 358 I.C.C. 638 (1978), and on facts virtually the same as those before us here held:

> The Railroads' attempt to distinguish the Sante Fe's position from that of the car line companies is without merit. This controversy involves Santa Fe not in its capacity as a line haul railroad, but in its capacity as a provider of mechanical protective services to railroads. The Santa Fe's operations in this capacity are governed by 49 U.S.C. 11105 (formerly section 1(14)(b) of the Act.) See *Southern Ry.* 412 F.Supp. at 1141. This issue was also dealt with in our 1972 report *Contracts—Pacific Fruit Exp. Co. & Akron, C. & Y. R. Co.*, I.C.C. 754, 770 (Answer to Question "N"):

> > N. Will the requirement to submit a contract, agreement, or arrangement for mechanical protective service to the Commission for approval under Section 1(14)(b) of the Interstate Commerce Act vary, depending on whether the mechanical refrigeration unit is owned by (a) a railroad owned carline company; (b) another railroad directly; or (c) a private car owner?

> > Answer: No. The requirements of section 1(14)(b) of the act are directed to the furnishing of the protective service. It is immaterial how the necessary instrumentalities were acquired by the person or company actually furnishing the service to others.

> The court and Commission precedents are controlling. . . .

The ICC, however, chose to ignore or was not aware of the authority in this circuit to the contrary. As we have stated before, the interpretation given a statute by a responsible agency—if reasonable—is entitled to considerable deference. With that standard in mind, we reexamine our earlier decision in *Rock Island*.

As to the distinction between "common carrier" and "person" relied on by us in *Rock Island*, it is true that the Interstate Commerce Act's use of the two terms is careful and deliberate. It does not necessarily follow, however, that the terms are mutually exclusive. "Common carrier" is defined in the Act to include "all *persons*, natural or artificial," engaged in transportation. 49 U.S.C. § 1(3)(a) (emphasis added). Thus, it is fair to say that "common carriers" defines a subset of the class of all "persons," and the use of the latter term does not necessarily exclude common carriers. Decisions of the courts have, on occasion, interpreted "person" as used in the Act to include a common carrier, at least when the carrier was acting in a capacity other than one normally assumed by a carrier. See *American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Ry.*, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967); *ICC v. Baltimore & Ohio R.R.*, 225 U.S. 326, 32 S.Ct. 742, 56 L.Ed. 1107 (1912); *Chicago, Rock Island & Pacific R.R. v. Chicago, Burlington & Quincy R.R.*, 301 F.Supp. 72 (N.D.Ill.1969), *aff'd*, 437 F.2d 6 (7th Cir.), *cert. denied*, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971). As the court in *Southern Railway* said: "Railroads as providers of protective service may similarly be regarded as persons." 412 F.Supp. at 1141 n.51.

We believe that our analysis in *Rock Island* of the legislative purpose of section 1(14)(b) was fundamentally correct. There seems to be little controversy that:

> The Commission sought enactment of § 1(14)(b) in 1940 because doubts as to its

jurisdiction over car line companies prevented close scrutiny of their relationship with their parent roads in determining the actual cost of providing protective service so that the Commission would have a proper basis for approving cost-related protective service tariff charges to be paid by shippers.

*Southern Railway*, 412 F.Supp. at 1130 (citing ICC, 45th Annual Report to the Congress 89, 121 (1931); *Charges for Protective Service to Perishable Freight*, 215 I.C.C. 684 (1936); *Refrigeration Charges on Fruits etc., from the South*, 151 I.C.C. 649, 693 (1929)). Indeed, we do not understand the ICC to be in disagreement with us on this issue. *See Contracts for Protective Services*, 358 I.C.C. 638, 647 (1978); *Contracts for Protective Services*, 246 I.C.C. 145, 150–51 (1941). This more modest purpose, however, is not inconsistent with a broader purpose to make common carriers subject to section 1(14)(b) when they act primarily in the capacity of providers of protective services to other railroads, not in their more customary role as line-haul carriers. *See Southern Railway*, 412 F.Supp. at 1141:

> In using the term "person" in § 1(14)(b), Congress broadened the Commission's authority to reach car line companies but it did not thereby withdraw its customary jurisdiction over carriers, particularly when the stated justification for regulating car lines was their symbiotic relationship, bordering that of an agency, to their parent lines.

Finally, there is little in the past practice of the Commission which is inconsistent with its interpretation of section 1(14)(b) as encompassing inter-carrier agreements for protective services. As this court itself recognized in *Rock Island*, the ICC has approved an inter-carrier agreement pursuant to section 1(14)(b) in the past, *see Contracts for Protective Services*, 278 I.C.C. 531 (1950), and evidence before this court indicates that it continues to do so. *See Contracts for Protective Services* (Feb. 22, 1978) (approving MPS contracts between Santa Fe as "contractor" and Elgin, Joliet and Eastern Railway Co., Southern Pacific Transportation Co., St. Louis Southwestern

Railway Co., and Union Pacific Railway Co. as "railroads"); *Contracts for Protective Services* (May 15, 1978) (approving contract between Santa Fe as contractor and Bangor and Aroostook Railway Co. as railroad and contract vice versa).

Evidence before this court tends to establish that mechanical protective services are rendered by Santa Fe in a capacity other than as a railroad participating in a joint movement of freight. Santa Fe, unlike most other railroads, has long owned and operated its own refrigerator cars instead of relying on intermediary carline companies. *See Contracts for Protective Services*, 246 I.C.C. 145, 149 (1941). An affidavit submitted by Santa Fe in support of its counterclaim alleges that of the four companies operating ninety-five percent of all mechanical protective service cars, Santa Fe is the second largest. The other three companies are carlines, but the nature of the service Santa Fe provides seems identical. The affidavit further submits that:

> In most instances Santa Fe-owned cars are utilized in transportation that takes place, at least in part, over Santa Fe-owned lines of railroad, but in other instances perishables move in Santa Fe-owned cars where no part of the line-haul transportation occurs over a Santa Fe line of railroad.

This evidence shows that there is ample reason for the Commission to regard Santa Fe's role in providing mechanical protective services as substantially the same as that of the carline companies.

The question of the proper scope of section 1(14)(b) is a close one and one that we would not necessarily answer—indeed did not answer—in the same way were we to make the determination in the first instance. The Commission's interpretation of the section, however, has a reasonable basis in the language of the statute and is consistent with the section's legislative history and the Commission's past practice. This case is an appropriate one, involving as it does issues of transportation policy, to defer to the Commission's interpretation in the

interest of uniform administration of the statutory scheme.[8] Although *Rock Island* is perhaps distinguishable on its facts, its rationale is plainly inconsistent with the interpretation which the Commission had given to section 1(14)(b) and it is hereby overruled.

Santa Fe's brief complains that "C&NW has never entered into an appropriate contract with Santa Fe for its use of Santa Fe's MPS cars. This Court should require it to do so now, and to obtain appropriate Commission approval of the contract." Although Santa Fe's counterclaim does not specifically request injunctive relief, its counterclaim does allege the refusal on the part of C&NW to comply with ICC regulations which, if proved, may entitle Santa Fe to equitable relief. *See* Fed.R.Civ.P. 54(c); *Pacific Fruit Express Co. v. Akron, Canton & Youngstown R.R.*, 355 F.Supp. 700, 709–10 (N.D.Cal.1973), *aff'd*, 524 F.2d 1025 (9th Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1107, 47 L.Ed.2d 315 (1976) (granting injunctive relief); *American Refrigerator Transit Co. v. Atchison, Topeka & Santa Fe Ry.*, 430 F.Supp. 1135 (E.D.Mo.1977) (same). Therefore, we cannot say that Santa Fe's counterclaim fails to state a claim upon which some relief can be granted and must therefore reverse the dismissal of the counterclaim.

We find, however, the question of whether Santa Fe is entitled to damages for C&NW's failure to comply with 49 C.F.R. § 1032.2 in the past more troublesome. Unfortunately, it raises issues not briefed by the parties. We share the concern of Judge Leventhal writing for the District of Columbia federal district court that the confusion surrounding the scope, meaning, and effect of the ICC's regulation after its promulgation and the Commission's refusal to clarify the regulation thereafter may render it unfair or indeed beyond the power of the Commission and the courts to impose liability for previous noncompliance. *See Southern Railway*, 412 F.Supp. at 1143–46. Judge Leventhal suggests that an award of damages under the circumstances might in effect amount to no more than a retroactive adjustment of past agreed divisions contrary to statutory restrictions imposed on the powers of the Commission, *see* 49 U.S.C. § 15(6); *Brimstone Railroad & Canal Co. v. United States*, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928), and the equitable limitations imposed upon the powers of the courts, *see Baltimore & Ohio R.R. v. Alabama Great Southern R.R.*, 165 U.S.App. D.C. 226, 506 F.2d 1265 (D.C.Cir.1974); *Atlantic Coast Line R.R. v. Delaware & H.R. Corp.*, 86 F.2d 721 (2d Cir. 1936).

Our concern has not been lessened by the Commission's decision holding that the stat-

---

**8.** The ICC's reliance in its January 9, 1979, decision on its answer in the *Pacific Fruit Express* case is a bit troublesome. *See Contracts—Pacific Fruit Express Co. v. Akron, Canton & Youngstown R.R.*, 340 I.C.C. 754, 770 (1972) (quoted *supra* at p. 15). First, the ICC's answers in the *Pacific Fruit Express* case were made on referral from a district court in an action by a carline company against a number of carriers. The Commission expressly noted that "our responses to the questions posed should not be considered as having application to any situation except that before the court." 340 I.C.C. at 754–55. Although the Commission subsequently has declared its interpretative ruling in *Pacific Fruit Express* to be of general applicability, *see Contracts for Protective Services*, 356 I.C.C. 95 (1976), we fail to see how this could affect the liability of the parties before us here. Moreover, Question "N" of the court and the Commission's answer to it do not seem directed at the present situation. In *Pacific Fruit Express* the plaintiff op-

erated a number of mechanical refrigerator cars. Some cars were owned by PFE, but many were leased from PFE's parent companies, the Southern Pacific and Union Pacific. The defendants asserted that this somehow diminished the validity of PFE's claim. PFE, on the other hand, maintained that the fact that it rented the cars from others was immaterial. 340 I.C.C. at 765 (¶ 21). Question "N" posed by the court seems directed toward determining the relevancy of the defendants' argument. The ICC ruling for the PFE determined that the ownership of the mechanical refrigeration unit was irrelevant. What was important, the Commission held, was the *furnishing* of the protective service, not the ownership of the unit: "It is immaterial how the necessary instrumentalities were acquired by the person or company actually furnishing the service to others." Left unanswered by the ICC's answer, as we read it, is whether common carriers are included among those "person[s] or compan[ies] actually furnishing the service to others."

ute and equitable principles do not prevent the imposition of liability for past noncompliance. *See Contracts for Protective Services*, 358 I.C.C. 638, 645–52 (1978). The Commission on remand from the D.C. federal district court dismissed that court's concerns about liability by sharply distinguishing between common carriers and carline companies.[9] Yet, in its denial of a petition to reconsider on January 9, 1979, the Commission did not confront the issue of Santa Fe's unusual position as a common carrier, a direct party to the division sheet, and a provider of mechanical protective services much like a carline company. Instead, the Commission merely stated that the controversy involved "Santa Fe not in its capacity as a line haul railroad, but in its capacity as a provider of mechanical protective services to railroads." It seems to us that the Commission has failed to grapple with the essence of the D.C. court's concern: the unfairness of retroactively altering divisions to which the railroads have already agreed.[10]

This action implicates questions of national transportation policy, the effectuation of which the Interstate Commerce Act makes the primary responsibility of the Commission. As this opinion illustrates, we give substantial weight to reasonable agency interpretations of a statute which the agency is charged to administer. This does not mean, however, that we must or will accept an agency's legal conclusions which are devoid of reasoning and which have no

apparent effect in furthering national policy. Under the circumstances, we do not believe that we can or should resolve this last question. It seems to depend in part on the capacity in which Santa Fe provided refrigerator cars to C&NW and the facts and circumstances surrounding Santa Fe's participation in the agreement between railroads on how to divide protective service charges. Further development of the facts, as well as additional briefing on the question, appear necessary before the question is decided. Therefore, we reinstate Santa Fe's claim for damages pending further development of the facts underlying its cause of action and remand the case for further proceedings consistent with this opinion. On remand, the district court should consider referring the liability and damages issues to the Commission, *see* 28 U.S.C. § 1336(b), for additional clarification so that the court can be fully apprised of the Commission's position with respect to the claim. *Cf. Atchison, Topeka & Santa Fe Ry. v. Baltimore & Ohio R.R.*, No. 74–1859 (E.D.Pa. June 22, 1976) (referring action to the Commission).

We reverse the judgment entered in favor of the plaintiff C&NW and direct entry of judgment in favor of Santa Fe on the plaintiff's main claim. We also reverse the judgment entered against Santa Fe in the counterclaim and remand the case for further proceedings consistent with this opinion.[11]

---

**9.** This controversy is not between carriers and does not involve divisions. Although there is some affinity between the carlines and their parents, they are separate entities. Indeed carlines do not appear as common carriers under section 1(3)(a) of the act.

. . . [Division Sheet 7] is not a contract to which any carline is a party.

. . . Section 15(6) is aimed at divisions of joint rates, fares, or charges; it does not, in our opinion, deal with the secondary divisions of revenues among parties not participating in "joint rates, fares or charges." *Contracts for Protective Services*, 358 I.C.C. 638, 646–48 (1978).

**10.** Unfortunately, a subsequent decision of the Commission in *Contracts for Protective Services*, 359 I.C.C. 867 (1979), has also failed to squarely address this issue.

**11.** In accordance with Circuit Rule 16(e), this opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing *in banc* on the question of declining to adopt the Eighth Circuit's construction of 49 U.S.C. § 16(3)(a) (now codified at 49 U.S.C. § 11706(a)) in *Thompson v. St. Louis-San Francisco Ry.*, 218 F.2d 166 (8th Cir. 1954), *cert. denied*, 348 U.S. 964, 75 S.Ct. 525, 99 L.Ed. 752 (1955), or on the question of overruling this court's construction of 49 U.S.C. § 1(14)(b) (now codified at 49 U.S.C. § 11105) in *Chicago & North Western Transportation Co. v. Chicago, Rock Island & Pacific R.R.*, 504 F.2d 453 (7th Cir. 1974). Circuit Judges Bauer and Cudahy did not participate in the consideration of any of the issues in this case.