(Slip Opinion)     OCTOBER TERM, 2006     1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

## Syllabus

## GLOBAL CROSSING TELECOMMUNICATIONS, INC. *v.* METROPHONES TELECOMMUNICATIONS, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 05–705.   Argued October 10, 2006—Decided April 17, 2007

Under authority of the Communications Act of 1934, the Federal Communications Commission (FCC) regulates interstate telephone communications using a traditional regulatory system similar to what other commissions have applied when regulating other common carriers. Indeed, Congress largely copied language from the earlier Interstate Commerce Act, which authorized federal railroad regulation, when it wrote Communications Act §§201(b) and 207, the provisions at issue. Both Acts authorize their respective commissions to declare any carrier "charge," "regulation," or "practice" in connection with the carrier's services to be "unjust or unreasonable"; declare an "unreasonable," *e.g.*, "charge" to be "unlawful"; authorize an injured person to recover "damages" for an "unlawful" charge or practice; and state that, to do so, the person may bring suit in a "court" "of the United States." Interstate Commerce Act §§1, 8, 9; Communications Act §§201(b), 206, 207. The underlying regulatory problem here arises at the intersection of traditional regulation and newer, more competitively oriented approaches. Legislation in 1990 required payphone operators to allow payphone users to obtain "free" access to the long-distance carrier of their choice, *i.e.,* access without depositing coins. But recognizing the "free" call would impose a cost upon the payphone operator, Congress required the FCC to promulgate regulations to provide compensation to such operators. Using traditional ratemaking methods, the FCC ordered carriers to reimburse the operators in a specified amount unless a carrier and an operator agreed to a different amount. The FCC subsequently determined that a carrier's refusal to pay such compensation was an "unreasonable practice" and thus unlawful under §201(b). Respondent payphone opera-

tor brought a federal lawsuit, claiming that petitioner long-distance carrier (hereinafter Global Crossing) had violated §201(b) by failing to pay compensation and that §207 authorized respondent to sue in federal court. The District Court agreed that Global Crossing's refusal to pay violated §201(b), thereby permitting respondent to sue under §207. The Ninth Circuit affirmed.

*Held:* The FCC's application of §201(b) to the carrier's refusal to pay compensation is lawful; and, given the linkage with §207, §207 authorizes this federal-court lawsuit. Pp. 7–19.

(a) The language of §§201(b), 206, and 207 and those sections' history, including that of their predecessors, Interstate Commerce Act §§8 and 9, make clear that §207's purpose is to allow persons injured by §201(b) violations to bring federal-court damages actions. The difficult question is whether the FCC regulation at issue lawfully implements §201(b)'s "unreasonable practice" prohibition. Pp. 7–9.

(b) The FCC's §201(b) "unreasonable practice" determination is reasonable, and thus lawful. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–844. It easily fits within the language of the statutory phrase. Moreover, the underlying regulated activity at issue resembles activity long regulated by both transportation and communications agencies. Traditionally, the FCC, exercising its rate-setting authority, has divided revenues from a call among providers of segments of the call. Transportation agencies have similarly divided revenues from a larger transportation service among providers of segments of the service. The payphone operator and long-distance carrier resemble those joint providers of a communication or transportation service. Differences between the present "unreasonable practice" classification and more traditional regulatory subject matter do not require a different outcome. When Congress revised the telecommunications laws in 1996 to enhance the role of competition, creating a system that relies in part upon competition and in part upon the role of tariffs in regulatory supervision, it left §201(b) in place. In light of the absence of any congressional prohibition, and the similarities with traditional regulatory action, the Court finds nothing unreasonable about the FCC's §201(b) determination. *United States* v. *Mead Corp.*, 533 U. S. 218, 229. Pp. 9–12.

(c) Additional arguments made by Global Crossing, its supporting *amici* and the dissents—that §207 does not authorize actions for violations of regulations promulgated to carry out statutory objectives; that no §207 action lies for violations of substantive regulations promulgated by the FCC; that §§201(a) and (b) concern only practices that harm carrier customers, not carrier suppliers; that the FCC's "unreasonable practice" determination is unlawful because it is in-

Syllabus

adequately reasoned; and that §276 prohibits the FCC's §201(b) classification—are ultimately unpersuasive. Pp. 12–19.

423 F. 3d 1056, affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, and ALITO, JJ., joined. SCALIA, J., and THOMAS, J., filed dissenting opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 05–705

————

## GLOBAL CROSSING TELECOMMUNICATIONS, INC., PETITIONER *v.* METROPHONES TELE- COMMUNICATIONS, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 17, 2007]

JUSTICE BREYER delivered the opinion of the Court.

The Federal Communications Commission (Commission or FCC) has established rules that require long-distance (and certain other) communications carriers to compensate a payphone operator when a caller uses a payphone to obtain free access to the carrier's lines (by dialing, *e.g.*, a 1–800 number or other access code). The Commission has added that a carrier's refusal to pay the compensation is a "practice . . . that is unjust or unreasonable" within the terms of the Communications Act of 1934, §201(b), 48 Stat. 1070, 47 U. S. C. §201(b). Communications Act language links §201(b) to §207, which authorizes any person "damaged" by a violation of §201(b) to bring a lawsuit to recover damages in federal court. And we must here decide whether this linked section, §207, authorizes a payphone operator to bring a federal-court lawsuit against a recalcitrant carrier that refuses to pay the compensation that the Commission's order says it owes.

In our view, the FCC's application of §201(b) to the carrier's refusal to pay compensation is a reasonable

interpretation of the statute; hence it is lawful. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–844, and n. 11 (1984). And, given the linkage with §207, we also conclude that §207 authorizes this federal-court lawsuit.

I

A

Because regulatory history helps to illuminate the proper interpretation and application of §§201(b) and 207, we begin with that history. When Congress enacted the Communications Act of 1934, it granted the FCC broad authority to regulate interstate telephone communications. See *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U. S. 355, 360 (1986). The Commission, during the first several decades of its history, used this authority to develop a traditional regulatory system much like the systems other commissions had applied when regulating railroads, public utilities, and other common carriers. A utility or carrier would file with a commission a tariff containing rates, and perhaps other practices, classifications, or regulations in connection with its provision of communications services. The commission would examine the rates, etc., and, after appropriate proceedings, approve them, set them aside, or, sometimes, set forth a substitute rate schedule or list of approved charges, classifications, or practices that the carrier or utility must follow. In doing so, the commission might determine the utility's or carrier's overall costs (including a reasonable profit), allocate costs to particular services, examine whether, and how, individual rates would generate revenue that would help cover those costs, and, if necessary, provide for a division of revenues among several carriers that together provided a single service. See 47 U. S. C. §§201(b), 203, 205(a); *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Serv. Comm'n of Mo.*, 262 U. S. 276, 291–295 (1923)

(Brandeis, J., concurring in judgment) (telecommunications); *Verizon Communications Inc.* v. *FCC*, 535 U. S. 467, 478 (2002) (same); *Chicago & North Western R. Co.* v. *Atchison, T. & S. F. R. Co.*, 387 U. S. 326, 331 (1967) (railroads); *Permian Basin Area Rate Cases*, 390 U. S. 747, 761–765, 806–808 (1968) (natural gas field production).

In authorizing this traditional form of regulation, Congress copied into the 1934 Communications Act language from the earlier Interstate Commerce Act of 1887, 24 Stat. 379, which (as amended) authorized federal railroad regulation. See *American Telephone & Telegraph Co.* v. *Central Office Telephone, Inc.*, 524 U. S. 214, 222 (1998). Indeed, Congress largely copied §§1, 8, and 9 of the Interstate Commerce Act when it wrote the language of Communications Act §§201(b) and 207, the sections at issue here. The relevant sections (in both statutes) authorize the commission to declare any carrier "charge," "regulation," or "practice" in connection with the carrier's services to be "unjust or unreasonable"; they declare an "unreasonable," *e.g.*, "charge" to be "unlawful"; they authorize an injured person to recover "damages" for an "unlawful" charge or practice; and they state that, to do so, the person may bring suit in a "court" "of the United States." Interstate Commerce Act §§1, 8, 9, 24 Stat. 379, 382; Communications Act §§201(b), 206, 207, 47 U. S. C. §§201(b), 206, 207.

Historically speaking, the Interstate Commerce Act sections changed early, preregulatory common-law rate-supervision procedures. The common law originally permitted a freight shipper to ask a *court* to determine whether a railroad rate was unreasonably high and to award the shipper damages in the form of "reparations." The "new" regulatory law, however, made clear that a commission, not a court, would determine a rate's reasonableness. At the same time, that "new" law permitted a shipper injured by an unreasonable rate to bring a federal

lawsuit to collect damages. Interstate Commerce Act §§1, 8–9; *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.*, 284 U. S. 370, 383–386 (1932); *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 436, 440–441 (1907); *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156, 162 (1922); *Louisville & Nashville R. Co.* v. *Ohio Valley Tie Co.*, 242 U. S. 288, 290–291 (1916); J. Ely, Railroads and American Law 71–72, 226–227 (2001); A. Hoogenboom & O. Hoogenboom, A History of the ICC 61 (1976). The similar language of Communications Act §§201(b) and 207 indicates a roughly similar sharing of agency authority with federal courts.

Beginning in the 1970's, the FCC came to believe that communications markets might efficiently support more than one firm and that competition might supplement (or provide a substitute for) traditional regulation. See *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 220–221 (1994). The Commission facilitated entry of new telecommunications carriers into long-distance markets. And in the 1990's, Congress amended the 1934 Act while also enacting new telecommunications statutes, in order to encourage (and sometimes to mandate) new competition. See Telecommunications Act of 1996, 110 Stat. 56, 47 U. S. C. §609 *et seq.* Neither Congress nor the Commission, however, totally abandoned traditional regulatory requirements. And the new statutes and amendments left many traditional requirements and related statutory provisions, including §§201(b) and 207, in place. *E.g.*, *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 975 (2005).

B

The regulatory problem that underlies this lawsuit arises at the intersection of traditional regulation and newer, more competitively oriented approaches. Compet-

ing long-distance carriers seek the business of individual local callers, including those who wish to make a long-distance call from a local payphone. A payphone operator, however, controls what is sometimes a necessary channel for the caller to reach the long-distance carrier. And prior to 1990, a payphone operator, exploiting this control, might require a caller to use a long-distance carrier that the operator favored while blocking access to the caller's preferred carrier. Such a practice substituted the operator's choice of carrier for the caller's, and it potentially placed disfavored carriers at a competitive disadvantage. In 1990, Congress enacted special legislation requiring payphone operators to allow a payphone user to obtain "free" access to the carrier of his or her choice, *i.e.*, access from the payphone without depositing coins. Telephone Operator Consumer Services Improvement Act of 1990, 104 Stat. 986, codified at 47 U. S. C. §226. (For ease of exposition, we often use familiar terms such as "long distance" and "free" calls instead of more precise terms such as "interexchange" and "coinless" or "dial-around" calls.)

At the same time, Congress recognized that the "free" call would impose a cost upon the payphone operator; and it consequently required the FCC to "prescribe regulations that . . . establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call." §276(b)(1)(A) of the Communications Act of 1934, as added by §151 of the Telecommunications Act of 1996, 110 Stat. 106, codified at 47 U. S. C. §276(b)(1)(A).

The FCC then considered the compensation problem. Using traditional ratemaking methods, it found that the (fixed and incremental) costs of a "free" call from a payphone to, say, a long-distance carrier warranted reimbursement of (at the time relevant to this litigation) $0.24 per call. The FCC ordered carriers to reimburse the pay-

phone operators in this amount unless a carrier and an operator agreed upon a different amount. 47 CFR §64.1300(d) (2005). At the same time, it left the carriers free to pass the cost along to their customers, the payphone callers. Thus, in a typical "free" call, the carrier will bill the caller and then must share the revenue the carrier receives—to the tune of $0.24 per call—with the payphone operator that has, together with the carrier, furnished a communications service to the caller. The FCC subsequently determined that a carrier's refusal to pay the compensation ordered amounts to an "unreasonable practice" within the terms of §201(b). (We shall refer to these regulations as the Compensation Order and the 2003 Payphone Order, respectively. See Appendix A, *infra,* for full citations.) See generally P. Huber, M. Kellogg, & J. Thorne, Federal Telecommunications Law §8.6.3, pp. 710–713 (2d ed. 1999) (hereinafter Huber). That determination, it believed, would permit a payphone operator to bring a federal-court lawsuit under §207, to collect the compensation owed. 2003 Payphone Order, 18 FCC Rcd. 19975, 19990, ¶32.

### C

In 2003, respondent, Metrophones Telecommunications, Inc., a payphone operator, brought this federal-court lawsuit against Global Crossing Telecommunications, Inc., a long-distance carrier. Metrophones sought compensation that it said Global Crossing owed it under the FCC's Compensation Order, 14 FCC Rcd. 2545 (1999). Insofar as is relevant here, Metrophones claimed that Global Crossing's refusal to pay amounted to a violation of §201(b), thereby permitting Metrophones to sue in federal court, under §207, for the compensation owed. The District Court agreed. 423 F. 3d 1056, 1061 (CA9 2005). The Ninth Circuit affirmed the District Court's determination. *Ibid.* We granted certiorari to determine whether §207

authorizes the lawsuit.

## II
## A

Section 207 says that "[a]ny person claiming to be damaged by any common carrier . . . may bring suit" against the carrier "in any district court of the United States" for "recovery of the *damages* for which such common carrier *may be liable* under the provisions of this chapter." 47 U. S. C. §207 (emphasis added). This language makes clear that the lawsuit is proper *if* the FCC could properly hold that a carrier's failure to pay compensation is an "unreasonable practice" deemed "unlawful" under §201(b). That is because the immediately preceding section, §206, says that a common carrier is "*liable*" for "*damages* sustained in consequence of" the carrier's doing "*any act, matter, or thing in this chapter* prohibited or *declared to be unlawful*." And §201(b) declares "*unlawful*" any common-carrier "charge, *practice*, classification, or regulation *that is unjust or unreasonable*." (See Appendix B, *infra*, for full text; emphasis added throughout).

The history of these sections—including that of their predecessors, §§8 and 9 of the Interstate Commerce Act— simply reinforces the language, making clear the purpose of §207 is to allow persons injured by §201(b) violations to bring federal-court damages actions. See, *e.g.*, *Arizona Grocery Co.*, 284 U. S., at 384–385 (Interstate Commerce Act §§8–9); Part I–A, *supra*. History also makes clear that the FCC has long implemented §201(b) through the issuance of rules and regulations. This is obviously so when the rules take the form of FCC approval or prescription for the future of rates that exclusively are "reasonable." See 47 U. S. C. §205 (authorizing the FCC to prescribe reasonable rates and practices in order to preclude rates or practices that violate §201(b)); 5 U. S. C. §551(4) ("'rule' . . . includes the approval or prescription for the future of

rates . . . or practices"). It is also so when the FCC has set forth rules that, for example, require certain accounting methods or insist upon certain carrier practices, while (as here) prohibiting others as unjust or unreasonable under §201(b). See, *e.g.* (to name a few), *Verizon Tel. Cos.* v. *FCC*, 453 F. 3d 487, 494 (CADC 2006) (rates unreasonable (and hence unlawful) if not adjusted pursuant to accounting rules ordered in FCC regulations); *Cable & Wireless P. L. C.* v. *FCC*, 166 F. 3d 1224, 1231 (CADC 1999) (failure to follow Commission-ordered settlement practices unreasonable); *MCI Telecommunications Corp.* v. *FCC*, 59 F. 3d 1407, 1414 (CADC 1995) (violation of rate-of-return prescription unlawful); *In re NOS Communications, Inc.*, 16 FCC Rcd. 8133, 8136, ¶6 (2001) (deceptive marketing an unreasonable practice); *In re Promotion of Competitive Networks in Local Telecommunications Markets*, 15 FCC Rcd. 22983, 23000, ¶35 (2000) (entering into exclusive contracts with commercial building owners an unreasonable practice).

Insofar as the statute's language is concerned, to violate a regulation that lawfully implements §201(b)'s requirements *is* to violate the statute. See, *e.g.*, *MCI Telecommunications Corp.*, 59 F. 3d, at 1414 ("We have repeatedly held that a rate-of-return prescription has the force of law and that the Commission may therefore treat a violation of the prescription as a *per se* violation of the requirement of the Communications Act that a common carrier maintain 'just and reasonable' rates, *see* 47 U. S. C. §201(b)"); cf. *Alexander* v. *Sandoval*, 532 U. S. 275, 284 (2001) (it is "meaningless to talk about a separate cause of action to enforce the regulations apart from the statute"). That is why private litigants have long assumed that they may, as the statute says, bring an action under §207 for violation of a rule or regulation that lawfully implements §201(b). See, *e.g.*, *Oh* v. *AT&T Corp.*, 76 F. Supp. 2d 551, 556 (NJ 1999) (assuming validity of §207 suit alleging violation of

§201(b) in carrier's failure to provide services listed in FCC-approved tariff); *Southwestern Bell Tel. Co.* v. *Allnet Communications Servs., Inc.*, 789 F. Supp. 302, 304–306 (ED Mo. 1992) (assuming validity of §207 suit to enforce FCC's determination of reasonable practices related to payment of access charges by long-distance carrier to local exchange carrier); cf., *e.g.*, *Chicago & North Western Transp. Co.* v. *Atchison, T. & S. F. R. Co.*, 609 F. 2d 1221, 1224–1225 (CA7 1979) (same in respect to Interstate Commerce Act equivalents of §§201(b), 207).

The difficult question, then, is not whether §207 covers actions that complain of a violation of §201(b) as lawfully implemented by an FCC regulation. It plainly does. It remains for us to decide whether the particular FCC regulation before us lawfully implements §201(b)'s "unreasonable practice" prohibition. We now turn to that question.

B

In our view the FCC's §201(b) "unreasonable practice" determination is a reasonable one; hence it is lawful. See *Chevron U. S. A. Inc.*, 467 U. S., at 843–844. The determination easily fits within the language of the statutory phrase. That is to say, in ordinary English, one can call a refusal to pay Commission-ordered compensation despite having received a benefit from the payphone operator a "practic[e] . . . in connection with [furnishing a] communication service . . . that is . . . unreasonable." The service that the payphone operator provides constitutes an integral part of the total long-distance service the payphone operator and the long-distance carrier together provide to the caller, with respect to the carriage of his or her particular call. The carrier's refusal to divide the revenues it receives from the caller with its collaborator, the payphone operator, despite the FCC's regulation requiring it to do so, can reasonably be called a "practice" "in connection

with" the provision of that service that is "unreasonable."
Cf. *post*, at 1–5 (THOMAS, J., dissenting).

Moreover, the underlying regulated activity at issue
here *resembles* activity that both transportation and com-
munications agencies have long regulated. Here the
agency has determined through traditional regulatory
methods the cost of carrying a portion (the payphone
portion) of a call that begins with a caller and proceeds
through the payphone, attached wires, local communica-
tions loops, and long-distance lines to a distant call recipi-
ent. The agency allocates costs among the joint providers
of the communications service and requires downstream
carriers, in effect, to pay an appropriate share of revenues
to upstream payphone operators. Traditionally, the FCC
has determined costs of some segments of a call while
requiring providers of other segments to divide related
revenues. See, *e.g.*, *Smith* v. *Illinois Bell Telephone Co.*,
282 U. S. 133, 148–151 (1930) (communications). And
traditionally, transportation agencies have determined
costs of providing some segments of a larger transporta-
tion service (for example, the cost of providing the San
Francisco–Ogden segment of a San Francisco–New York
shipment) while requiring providers of other segments to
divide revenues. See, *e.g.*, *New England Divisions Case*,
261 U. S. 184 (1923); *Chicago & North Western R. Co.*, 387
U. S. 326; cf. *Cable & Wireless P. L. C.*, *supra*, at 1231. In
all instances an agency allocates costs and provides for a
related sharing of revenues.

In these more traditional instances, transportation
carriers and communications firms entitled to revenues
under rate divisions or cost allocations might bring law-
suits under §207, or the equivalent sections of the Inter-
state Commerce Act, and obtain compensation or dam-
ages. See, *e.g.*, *Allnet Communication Serv., Inc.* v.
*National Exch. Carrier Assn., Inc.,* 965 F. 2d 1118, 1122
(CADC 1992) (§207); *Southwestern Bell Tel. Co.*, *supra*, at

305 (same); *Chicago & North Western Transp. Co.*, *supra*, at 1224–1225 (Interstate Commerce Act equivalent of §207). Again, the similarities support the reasonableness of an agency's bringing about a similar result here. We do not suggest that the FCC is required to find carriers' failures to divide revenues to be §201(b) violations in every instance. Cf. *U. S. Telepacific Corp.* v. *Tel-America of Salt Lake City, Inc.*, 19 FCC Rcd. 24552, 24555–24556, and n. 27 (2004) (citing cases). Nor do we suggest that every violation of FCC regulations is an unjust and unreasonable practice. Here there is an explicit statutory scheme, and compensation of payphone operators is necessary to the proper implementation of that scheme. Under these circumstances, the FCC's finding that the failure to follow the order is an unreasonable practice is well within its authority.

There are, of course, differences between the present "unreasonable practice" classification and the similar more traditional regulatory subject matter we have just described. For one thing, the connection between payphone operators and long-distance carriers is not a traditional "through route" between carriers. See §201(a). For another, as Global Crossing's *amici* point out, the word "practice" in §201(b) has traditionally applied to a carrier practice that (unlike the present one) is the subject of a carrier tariff—*i.e.*, a carrier agency filing that sets forth the carrier's rates, classifications, and practices. Brief for AT&T et al. as *Amici Curiae* 8–11. We concede the differences. Indeed, traditionally, the filing of tariffs was "the centerpiece" of the "[Communications] Act's regulatory scheme." *MCI Telecommunications Corp.,* 512 U. S., at 220. But we do not concede that these differences require a different outcome. Statutory changes enhancing the role of competition have radically reduced the role that tariffs play in regulatory supervision of what is now a mixed communications system—a system that relies in part upon

competition and in part upon more traditional regulation. Yet when Congress rewrote the law to bring about these changes, it nonetheless left §201(b) in place. That fact indicates that the statute permits, indeed it suggests that Congress likely expected, the FCC to pour new substantive wine into its old regulatory bottles. See Policy and Rules Concerning the Interstate, Interexchange Marketplace, 12 FCC Rcd. 15014, 15057, ¶77 (1997) (despite the absence of tariffs, FCC's §201 enforcement obligations have not diminished); *Boomer* v. *AT&T Corp.*, 309 F. 3d 404, 422 (CA7 2002) (same). And this circumstance, by indicating that Congress did not *forbid* the agency to apply §201(b) differently in the changed regulatory environment, is sufficient to convince us that the FCC's determination is lawful.

That is because we have made clear that where "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law," a court "is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation" (or the manner in which it fills the "gap") is "reasonable." *United States* v. *Mead Corp.*, 533 U. S. 218, 229 (2001); *National Cable & Telecommunications Assn.*, 545 U. S., at 980; *Chevron U. S. A. Inc.,* 467 U. S., at 843–844. Congress, in §201(b), delegated to the agency authority to "fill" a "gap," *i.e.*, to apply §201 through regulations and orders with the force of law. *National Cable & Telecommunications Assn., supra,* at 980–981. The circumstances mentioned above make clear the absence of any relevant congressional prohibition. And, in light of the traditional regulatory similarities that we have discussed, we can find nothing unreasonable about the FCC's §201(b) determination.

### C

Global Crossing, its supporting *amici*, and the dissents make several additional but ultimately unpersuasive arguments. First, Global Crossing claims that §207 authorizes only actions "seeking damages for *statutory* violations" and not for "violations merely of *regulations* promulgated to carry out statutory objectives." Brief for Petitioner 12 (emphasis in original). The lawsuit before us, however, "seek[s] damages for [a] *statutory* violatio[n]," namely, a violation of §201(b)'s prohibition of an "unreasonable practice." As we have pointed out, *supra*, at 8, §201(b)'s prohibitions have long been thought to extend to rates that diverge from FCC prescriptions, as well as rates or practices that are "unreasonable" in light of their failure to reflect rules embodied in an agency regulation. We have found no limitation of the kind Global Crossing suggests.

Global Crossing seeks to draw support from *Alexander* v. *Sandoval*, 532 U. S. 275 (2001), and *Adams Fruit Co.* v. *Barrett*, 494 U. S. 638 (1990), which, Global Crossing says, hold that an agency cannot determine through regulation when a private party may bring a federal court action. Those cases do involve private actions, but they do not support Global Crossing. The cases involve different statutes and different regulations, and the Court made clear in each of those cases that its holding relied on the specific statute before it. In *Sandoval, supra*, at 288–289, the Court found that an implied right of action to enforce one statutory provision, 42 U. S. C. §2000d, did not extend to regulations implementing another, §2000d–1. In contrast, here we are addressing the FCC's reasonable interpretation of ambiguous language in a substantive statutory provision, 47 U. S. C. §201(b), which Congress expressly linked to the right of action provided in §207. Nothing in *Sandoval* requires us to limit our deference to the FCC's reasonable interpretation of §201(b); to the

contrary, as we noted in *Sandoval*, it is "meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well." 532 U. S., at 284. In *Adams Fruit Co., supra,* at 646–647, we rejected an agency interpretation of the worker-protection statute at issue as contrary to "the plain meaning of the statute's language." Given the differences in statutory language, context, and history, those two cases are simply beside the point.

Our analysis does not change in this case simply because the practice deemed unreasonable (and hence unlawful) in the 2003 Payphone Order is violation of an FCC regulation adopted under authority of a separate statutory section, §276. The FCC here, acting under the authority of §276, has prescribed a particular rate (and a division of revenues) applicable to a portion of a long-distance service, and it has ordered carriers to reimburse payphone operators for the relevant portion of the service they jointly provide. But the conclusion that it is "unreasonable" to fail so to reimburse is not a §276 conclusion; it is a §201(b) conclusion. And courts have treated a carrier's failure to follow closely analogous agency rate and rate-division determinations as we treat the matter at issue here. That is to say, the FCC properly implements §201(b) when it reasonably finds that the failure to follow a Commission, *e.g.*, rate or rate-division determination made under a *different* statutory provision is unjust or unreasonable under §201(b). See, *e.g.*, *MCI Telecommunications Corp.*, 59 F. 3d, at 1414 (failure to follow a rate promulgated under §205 properly considered unreasonable under §201(b)); see also *Baltimore & O. R. Co.* v. *Alabama Great Southern R. Co.*, 506 F. 2d 1265, 1270 (CADC 1974) (statutory obligation to provide reasonable rate divisions is "implemented by orders of the ICC" issued pursuant to a

*separate* statutory provision). Moreover, in resting our conclusion upon the analogy with rate setting and rate divisions, the traditional, historical subject matter of §201(b), we avoid authorizing the FCC to turn §§201(b) and 207 into a back-door remedy for violation of FCC regulations.

Second, JUSTICE SCALIA, dissenting, says that the "only serious issue presented by this case [is] whether a practice that is *not* in and of itself unjust or unreasonable can be rendered such (and thus rendered in violation of the Act itself) because it violates a substantive regulation of the Commission." *Post*, at 2–3. He answers this question "no," because, in his view, a "violation of a substantive regulation promulgated by the Commission is not a violation of the Act, and thus does not give rise to a private cause of action.*" Post*, at 3. We cannot accept either JUSTICE SCALIA's statement of the "serious issue" or his answer.

We do not accept his statement of the issue because whether the practice is "in and of itself" unreasonable is irrelevant. The FCC has authoritatively ruled that carriers must compensate payphone operators. The only practice before us, then, and the only one we consider, is the carrier's violation of that FCC regulation requiring the carrier to pay the payphone operator a fair portion of the total cost of carrying a call that they jointly carried—each supplying a partial portion of the total carriage. A practice of violating the FCC's order to pay a fair share would seem fairly characterized in ordinary English as an "unjust practice," so why should the FCC not call it the same under §201(b)?

Nor can we agree with JUSTICE SCALIA's claim that a "violation of a *substantive regulation* promulgated by the Commission is not a violation of" §201(b) of the Act when, as here, the Commission has explicitly and reasonably ruled that the particular regulatory violation *does* violate

§201(b).  (Emphasis added.)  And what has the substantive/interpretive distinction that JUSTICE SCALIA emphasizes, *post*, at 3, to do with the matter?  There is certainly no reference to this distinction in §201(b); the text does not suggest that, of all violations of regulations, only violations of *interpretive* regulations can amount to unjust or unreasonable practices.  Why believe that Congress, which scarcely knew of this distinction a century ago before the blossoming of administrative law, would care which kind of regulation was at issue?  And even if this distinction were relevant, the FCC has long set forth what we now would call "substantive" (or "legislative") rules under §205.  Cf. 1 R. Pierce, Administrative Law Treatise §6.4, p. 325 (4th ed. 2002); *post*, at 4.  And violations of those substantive §205 regulations have clearly been deemed violations of §201(b).  *E.g.*, *MCI Telecommunications Corp.*, 59 F. 3d, at 1414.  Conversely, we have found no case at all in which a private plaintiff was kept out of federal court because the §201(b) violation it challenged took the form of a "substantive regulation" rather than an "interpretive regulation."  Insofar as JUSTICE SCALIA uses adjectives such as "traditional" or "textually based" to describe his distinctions, *post*, at 4, and "novel" or "absurd" to describe ours, *post*, at 5, 2,  we would simply note our disagreement.

We concede that JUSTICE SCALIA cites three sources in support of his theory.  See *post*, at 3.  But, in our view, those sources offer him no support.  None of those sources involved an FCC application of, or an FCC interpretation of, the section at issue here, namely §201(b).  Nor did any involve a regulation—substantive or interpretive—promulgated subsequent to the authority of §201(b).  Thus none is relevant to the case at hand.  See *APCC Servs., Inc.* v. *Sprint Communications Co.*, 418 F. 3d 1238, 1247 (CADC 2005) *(per curiam)* ("There was no authoritative interpretation of §201(b) in this case"); *Greene* v. *Sprint Communications Co.*, 340 F. 3d 1047, 1052 (CA9 2003)

(violation of substantive regulation does not violate §276; silent as to §201(b)). The single judge who thought that the FCC had authoritatively interpreted §201(b) (as has occurred in the case before us) would have reached the same conclusion that we do. *APCC Servs., Inc.*, *supra*, at 1254. (D. H. Ginsburg, C. J., dissenting) (finding a private cause of action, because there *was* "clearly an authoritative interpretation of §201(b)" that deemed the practice in question unlawful). See also Huber §3.14.3, p. 317 (no discussion of §201(b)).

Third, JUSTICE THOMAS (who also does not adopt JUSTICE SCALIA's arguments) disagrees with the FCC's interpretation of the term "practice." He, along with Global Crossing, claims instead that §§201(a) and (b) concern only practices that harm carrier *customers,* not carrier *suppliers. Post*, at 2–4 (dissenting opinion); Brief for Petitioner 37–38. But that is not what those sections say. Nor does history offer this position significant support. A violation of a regulation or order dividing rates among railroads, for example, would likely have harmed another carrier, not a shipper. See, *e.g.*, *Chicago & North Western Transp. Co.,* 609 F. 2d, at 1225–1226 ("Act . . . provides for the regulation of inter-carrier relations as a part of its general rate policy"). Once one takes account of this fact, it seems reasonable, not unreasonable, to include as a §201(b) (and §207) beneficiary a firm that performs services roughly analogous to the transportation of one segment of a longer call. We are not here dealing with a firm that supplies office supplies or manual labor. Cf., *e.g.*, *Missouri Pacific R. Co.* v. *Norwood*, 283 U. S. 249, 257 (1931) ("practice" in §1 of the Interstate Commerce Act does not encompass employment decisions). The long-distance carrier ordered by the FCC to compensate the payphone operator is so ordered in its role as a provider of communications services, not as a consumer of office supplies or the like. It is precisely because the carrier and the

payphone operator *jointly* provide a communications service to the caller that the carrier is ordered to share with the payphone operator the revenue that only the carrier is permitted to demand from the caller. Cf. *Cable & Wireless P. L. C.*, 166 F. 3d, at 1231 (finding that §201(b) enables the Commission to regulate not "only the terms on which U. S. carriers offer telecommunication services to the public," but also "the prices U. S. carriers pay" to foreign carriers providing the foreign segment of an international call).

Fourth, Global Crossing argues that the FCC's "unreasonable practice" determination is unlawful because it is inadequately reasoned. We concede that the FCC's initial opinion simply states that the carrier's practice is unreasonable under §201(b). But the context and cross-referenced opinions, 2003 Payphone Order, 18 FCC Rcd., at 19990, ¶32 (citing *American Public Communications Council* v. *FCC*, 215 F. 3d 51, 56 (CADC 2000)), make the FCC's rationale obvious, namely, that in light of the history that we set forth *supra*, at 7–9, it is unreasonable for a carrier to violate the FCC's mandate that it pay compensation. See also *In re APCC Servs., Inc.* v. *NetworkIP, LLC*, 21 FCC Rcd. 10488, 10493–10495, ¶¶ 13–16 (2006) (Order) (spelling out the reasoning).

Fifth Global Crossing argues that a different statutory provision, §276, see *supra*, at 5, prohibits the FCC's §201(b) classification. Brief for Petitioner 26–28. But §276 simply requires the FCC to "take all actions necessary . . . to prescribe regulations that . . . establish a per call compensation plan to ensure" that payphone operators "are fairly compensated." 47 U. S. C. §276(b)(1). It nowhere forbids the FCC to rely on §201(b). Rather, by helping to secure enforcement of the mandated regulations the FCC furthers basic §276 purposes.

Finally, Global Crossing seeks to rest its claim of a §276 prohibition upon the fact that §276 requires regulations

that secure compensation for "every completed *intrastate*," as well as every "*interstate*" payphone-related call, while §201(b) (referring to §201(a)) extends only to "*interstate or foreign*" communication. Brief for Petitioner 37. But Global Crossing makes too much of too little. We can assume (for argument's sake) that §201(b) may consequently apply only to a *portion* of the Compensation Order's requirements. But cf., *e.g.*, *Louisiana Pub. Serv. Comm'n*, 476 U. S., at 375, n. 4 (suggesting approval of FCC authority where it is "*not* possible to separate the interstate and the intrastate components"). But even if that is so (and we repeat that we do not decide this question), the FCC's classification will help to achieve a substantial portion of its §276 compensatory mission. And we cannot imagine why Congress would have (implicitly in this §276 language) wished to forbid the FCC from concluding that an interstate half loaf is better than none.

For these reasons, the judgment of the Ninth Circuit is affirmed.

*It is so ordered.*

APPENDIXES TO OPINION OF THE COURT

A

*In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* 14 FCC Rcd. 2545, 2631–2632, ¶¶190–191 (1999) (Compensation Order).

*In re the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* 18 FCC Rcd. 19975, 19990, ¶32 (2003) (2003 Payphone Order).

B

Communications Act §201:

"(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

"(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided,* That communications by wire or radio sub-

Appendix B to opinion of the Court

ject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further*, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further*, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter." 47 U. S. C. §201.

Communications Act §206:

"In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of

22 GLOBAL CROSSING TELECOMMUNICATIONS, INC. *v.*
METROPHONES TELECOMMUNICATIONS, INC.

Appendix B to opinion of the Court

the costs in the case." 47 U. S. C. §206.

Communications Act §207:

> "Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies." 47 U. S. C. §207.

# SUPREME COURT OF THE UNITED STATES

No. 05–705

GLOBAL CROSSING TELECOMMUNICATIONS, INC.,
PETITIONER *v.* METROPHONES TELE-
COMMUNICATIONS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 17, 2007]

JUSTICE SCALIA, dissenting.

Section 276(b)(1)(A) of the Communications Act of 1934, as added by the Telecommunication Act of 1996, instructed the Federal Communications Commission (FCC or Commission) to issue regulations establishing a plan to compensate payphone operators, leaving it up to the FCC to prescribe who should pay and how much. Pursuant to that authority, the FCC promulgated a substantive regulation that required carriers to compensate payphone operators at a rate of 24 cents per call (the payphone-compensation regulation). The FCC subsequently declared a carrier's failure to comply with the payphone-compensation regulation to be unlawful under §201(b) of the Act (which prohibits certain "unjust or unreasonable" practices) and privately actionable under §206 of the Act (which establishes a private cause of action for violations of the Act). Today's judgment can be defended only by accepting either of two propositions with respect to these laws: (1) that a carrier's failure to pay the prescribed compensation, in and of itself and apart from the Commission's payphone-compensation regulation, is an unjust or unreasonable practice in violation of §201(b); or (2) that a carrier's failure to pay the prescribed compensation is an "unjust or unreasonable" practice under §201(b) because it

violates the Commission's payphone-compensation regulation.

The Court coyly avoids rejecting the first proposition. But make no mistake: that proposition is utterly implausible, which is perhaps why it is nowhere to be found in the FCC's opinion. The unjustness or unreasonableness in this case, if any, consists precisely of violating the FCC's payphone-compensation regulation.[1] Absent that regulation, it would be neither unjust nor unreasonable for a carrier to decline to act as collection agent for payphone companies. The person using the services of the payphone company to obtain access to the carrier's network is not the carrier but the caller. It is absurd to suggest some natural obligation on the part of the carrier to identify payphone use, bill its customer for that use, and forward the proceeds to the payphone company. As a regulatory command, that makes sense (though the free-rider problem might have been solved in some other fashion); but, absent the Commission's substantive regulation, it would be in no way unjust or unreasonable for the carrier to do nothing. Indeed, if a carrier's failure to pay payphone compensation had been unjust or unreasonable in its own right, the Commission's payphone-compensation regulation would have been unnecessary, and the payphone

—————

[1] See *In re the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 18 FCC Rcd. 19975, 19990, ¶32 (2003) ("[F]ailure to pay in accordance with the Commission's payphone rules, such as the rules expressly requiring such payment . . . constitutes . . . an unjust and unreasonable practice in violation of section 201(b)"); *In re APCC Servs., Inc.* v. *NetworkIP, LLC,* 21 FCC Rcd. 10488, 10493, ¶15 (2006) ("[F]ailure to pay payphone compensation rises to the level of being 'unjust and unreasonable' " because it is "a direct violation of Commission rules"); *id.*, at 10493, ¶15, and n. 46 ("The fact that a failure to pay payphone compensation directly violates Commission rules specifically requiring such payment distinguishes this situation from other situations where the Commission has repeatedly declined to entertain 'collection actions' ").

companies could have sued directly for violation of §201(b).

The only serious issue presented by this case relates to the second proposition: whether a practice that is *not* in and of itself unjust or unreasonable can be rendered such (and thus rendered in violation of the Act itself) because it violates a substantive regulation of the Commission. Today's opinion seems to answer that question in the affirmative, at least with respect to the particular regulation at issue here. That conclusion, however, conflicts with the Communications Act's carefully delineated remedial scheme. The Act draws a clear distinction between private actions to enforce *interpretive regulations* (by which I mean regulations that reasonably and authoritatively construe the statute itself) and private actions to enforce *substantive regulations* (by which I mean regulations promulgated pursuant to an express delegation of authority to impose freestanding legal obligations beyond those created by the statute itself). Section 206 of the Act establishes a private cause of action for violations of the Act itself—and violation of an FCC regulation authoritatively interpreting the Act *is* a violation of the Act itself. (As the Court explains, when it comes to regulations that "reasonabl[y] [and] authoritatively construe the statute itself," *Alexander* v. *Sandoval*, 532 U. S. 275, 284 (2001), "it is 'meaningless to talk about a separate cause of action to enforce the regulations apart from the statute.'" *Ante*, at 8 (quoting *Sandoval, supra*, at 284).) On the other hand, violation of a substantive regulation promulgated by the Commission is not a violation of the Act, and thus does not give rise to a private cause of action under §206. See, *e.g., APCC Servs., Inc.* v. *Sprint Communications Co.*, 418 F. 3d 1238, 1247 (CADC 2005) *(per curiam),* cert. pending, No. 05–766; *Greene* v. *Sprint Communications Co.*, 340 F. 3d 1047, 1052 (CA9 2003), cert. denied, 541 U. S. 988 (2004); P. Huber, M. Kellogg, & J. Thorne, Federal Tele-

communications Law §3.14.3 (2d ed. 1999).[2]  That is why
Congress has separately created private rights of action
for violation of *certain* substantive regulations.  See, *e.g.*,
47 U. S. C. §227(b)(3) (violation of substantive regulations
prescribed under §227(b) (2000 ed. and Supp. III));
§227(c)(5) (violation of substantive regulations prescribed
under §227(c)).   These do not include the payphone-
compensation regulation authorized by §276(b).

There is no doubt that interpretive rules can be issued
pursuant to §201(b)—that is, rules which specify that
certain practices are in and of themselves "unjust or un-
reasonable."   Orders issued under §205 of the Act, see
*ante,* at 14, which authorizes the FCC, *upon finding that a
practice will be unjust and unreasonable,* to order the
carrier to adopt a just and reasonable practice in its place,
similarly implement the statute's proscription against
unjust or unreasonable practices.  But, as explained above,
the payphone-compensation regulation does not imple-
ment §201(b) and is not predicated on a finding of what
would be unjust and unreasonable absent the regulation.

The Court naively describes the question posed by this
case as follows: Since "[a] practice of violating the FCC's
order to pay a fair share would seem fairly characterized
in ordinary English as an 'unjust practice,' . . . why should
the FCC not call it the same under §201(b)?"  *Ante,* at 15.
There are at least three reasons why it is not as simple as
that.  (1) There has been no FCC "order" in the ordinary

_____

[2] The Court asserts that "[n]one of th[ese] [cases] involved an FCC
application of, or an FCC interpretation of, the relevant section, namely
§201(b)[,] nor did any involve a regulation—substantive or interpre-
tive—promulgated subsequent to the authority of §201(b)."  *Ante,* at 16.
I agree.  They involved *the payphone-compensation regulation*, which
was not promulgated pursuant to §201(b), but pursuant to §276.  The
relevant point is that violations of substantive regulations are *not*
directly actionable under §206.

sense, see 5 U. S. C. §551(6), but only an FCC regulation.[3] That is to say, the FCC has never determined that petitioner is in violation of its regulation and ordered compliance. Rather, respondent has alleged such a violation and has brought that allegation directly to District Court without prior agency adjudication. (2) The "practice of violating" virtually any FCC regulation can be characterized ("in ordinary English") as an "unjust practice"—or if not that, then an "unreasonable practice"—so that *all* FCC regulations become subject to private damage actions. Thus, the traditional (and textually based) distinction between private enforceability of interpretive rules, and private nonenforceability of substantive rules is effectively destroyed. And (3) it is not up to the FCC to "call it" an unjust practice or not. If it were, agency discretion might limit the regulations available for harassing litigation by telecommunications competitors. In fact, however, the practice of violating one or another substantive rule either *is* or *is not* an unjust or unreasonable practice under §201(b). The Commission is entitled to *Chevron* deference with respect to that determination at the margins, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), but it will always remain within the power of private parties to go directly to court, asserting that a particular violation of a substantive rule is ("in ordinary English") "unjust" or "unreasonable" and hence provides the basis for suit under §201(b).

The Court asks (more naively still) "what has the substantive/interpretive distinction that [this dissent] emphasizes to do with the matter? There is certainly no refer-

———————

[3] The Court's departure from ordinary usage is made possible by the fact that "the FCC commonly adopts rules in opinions called 'orders.'" *New England Tel. & Tel. Co.* v. *Public Util. Comm'n of Me.*, 742 F. 2d 1, 8–9 (CA1 1984) (Breyer, J.). If there had been violation of an FCC order in this case, a private action would have been available under §407 of the Act.

ence to this distinction in §201(b) . . . . Why believe that
Congress, which scarcely knew of this distinction a cen-
tury ago before the blossoming of administrative law,
would care which kind of regulation was at issue?" *Ante*,
at 15–16 (citation omitted). The answer to these questions
is obvious. Section 206 (which was enacted at the same
time as §201(b), see 48 Stat. 1070, 1072) does not *explicitly*
refer to the distinction between interpretive and substan-
tive regulations. And yet the Court acknowledges that,
while a violation of an *interpretive* regulation is actionable
under §206 (as a violation of the statute itself), a violation
of a *substantive* regulation is not. (Were this not true, the
Court's lengthy discussion of §201(b) would be wholly
unnecessary because violation of the payphone-
compensation regulation would be directly actionable
under §206.) The Court evidently believes that Congress
went out of its way to exclude from §206 private actions
that did not charge violation of the Act itself (or regula-
tions that authoritatively interpret the Act) but was per-
fectly willing to have those very same private actions
brought in through the back door of §201(b) as an "inter-
pretation" of "unjust or unreasonable practice." It does not
take familiarity with "the blossoming of administrative
law" to perceive that this would be nonsensical.[4]

   Seemingly aware that it is in danger of rendering the
limitation upon §206 a nullity, the Court seeks to limit its
novel approval of private actions for violation of substan-

_____

   [4] The Court further asserts that the "the FCC has long set forth what
we now call 'substantive' (or 'legislative') rules under §205," "violations
of [which] . . . have clearly been deemed violations of §201(b)," *ante*, at
16. The §205 orders to which the Court refers are not substantive in
the relevant sense because *they interpret §201(b)'s prohibition against
unjust and unreasonable rates or practices.* See *ante*, at 7 (§205 "au-
thoriz[es] the FCC to prescribe reasonable rates and practices in order
to preclude rates or practices that violate §201(b)"). The payphone-
compensation regulation, by contrast, does not interpret §201(b) or any
other statutory provision.

tive rules to substantive rules that are *"analog[ous] with rate-setting and rate divisions, the traditional, historical subject matter of §201(b),"* *ante*, at 14–15 (emphasis added). There is absolutely no basis in the statute for this distinction (nor is it anywhere to be found in the FCC's opinion). As I have described earlier, interpretive regulations are privately enforceable because to violate them *is* to violate the Act, within the meaning of the private-suit provision of §206. That a substantive regulation is *analogous* to traditional interpretive regulations, in the sense of dealing with subjects that those regulations have traditionally addressed, is supremely irrelevant to whether violation of the substantive regulation *is* a violation of the Act—which is the only pertinent inquiry. The only thing to be said for the Court's inventive distinction is that it enables its holding to stand without massive damage to the statutory scheme. Better an irrational limitation, I suppose, than no limitation at all; even though it is unclear how restrictive that limitation will turn out to be. What other substantive regulations are out there, one wonders, that can be regarded as "analogous" to actions the Commission has traditionally taken through interpretive regulations under §201(b)?

It is difficult to comprehend what public good the Court thinks it is achieving by its introduction of an unprincipled exception into what has hitherto been a clearly understood statutory scheme. Even without the availability of private remedies, the payphone-compensation regulation would hardly go unenforced. The Commission is authorized to impose civil forfeiture penalties of up to $100,000 per violation (or per day, for continuing violations) against common carriers that "willfully or repeatedly fai[l] to comply with . . . any rule, regulation, or order issued by the Commission." 47 U. S. C. §503(b)(1)(B). And the Commission can even place enforcement in private hands by issuing a privately enforceable order forbidding

continued violation.  See §§154(i), 276(b)(1)(A), 407.  Such an order, however, would require a prior Commission adjudication that the regulation had been violated, thus leaving that determination in the hands of the agency rather than a court, and preventing the unjustified private suits that today's decision allows.

I would hold that a private action to enforce an FCC regulation under §§201(b) and 206 does not lie unless the regulated practice is "unjust or unreasonable" *in its own right* and apart from the fact that a substantive regulation of the Commission has prohibited it.  As the practice regulated by the payphone-compensation regulation does not plausibly fit that description, I would reverse the judgment of the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

No. 05–705

GLOBAL CROSSING TELECOMMUNICATIONS, INC.,
PETITIONER *v.* METROPHONES TELE-
COMMUNICATIONS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 17, 2007]

JUSTICE THOMAS, dissenting.

The Court holds that failure to pay a payphone operator for coinless calls is an "unjust or unreasonable" "practice" under 47 U. S. C. §201(b). Properly understood, however, §201 does not reach the conduct at issue here. Failing to pay is not a "practice" under §201 because that section regulates the activities of telecommunications firms in their role as *providers* of telecommunications services. As such, §201(b) does not reach the behavior of telecommunication firms in other aspects of their business. I respectfully dissent.

I

The meaning of §201(b) of the Communications Act of 1934 becomes clear when read, as it should be, as a part of the entirety of §201. Subsection (a) sets out the duties and broad discretionary powers of a common carrier:

"It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and . . . to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide fa-

cilities and regulations for operating such through routes."

Immediately following that description of duties and powers, subsection (b) requires:

"All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . ."

The "charges, practices, classifications, and regulations" referred to in subsection (b) are those "establish[ed]" under subsection (a). Having given common carriers discretionary power to set charges and establish regulations in subsection (a), Congress required in subsection (b) that the exercise of this power be "just and reasonable." Thus, unless failing to pay a payphone operator arises from one of the duties under subsection (a), it is not a "practice" within the meaning of subsection (b).

Subsection (a) prescribes a carrier's duty to render service either to customers ("furnish[ing] . . . communication service") or to other carriers (*e.g.*, "establish[ing] physical connections"); it does not set out duties related to the receipt of service from suppliers. Consequently, given the relationship between subsections (a) and (b), subsection (b) covers only those "practices" connected with the *provision* of service to customers or other carriers. The Court embraced this critical limitation in *Missouri Pacific R. Co.* v. *Norwood*, 283 U. S. 249 (1931), which held that the term "practice" means a "'practice' in connection with the fixing of rates to be charged and prescribing of service to be rendered by the carriers." *Id.,* at 257. In *Norwood*, the Court interpreted language from the Interstate Commerce Act (as amended by the Mann-Elkins Act) that Congress just three years later copied into the Communi-

cations Act. *Ante*, at 3; see §7 of the Mann-Elkins Act of 1910, 36 Stat. 546. In passing the Communications Act, Congress may "be presumed to have had knowledge" and to have approved of the Court's interpretation in *Norwood.* See *Lorillard* v. *Pons*, 434 U. S. 575, 581 (1978). As a result, the Supreme Court's contemporaneous interpretation of "practice" should bear heavily on our analysis.

Other terms in §201 support using *Norwood*'s restrictive interpretation of "practice." A word "is known by the company it keeps," and one should not "ascrib[e] to one word a meaning so broad that it is inconsistent with its accompanying words." *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 575 (1995). Of the quartet "charges, practices, classifications, and regulations," the terms "charges," "classifications," and "regulations" could apply only to the party "furnish[ing]" service. "[C]harges" refers to the charges for physical connections and through routes. 47 U. S. C. §§201(a), 202(b). "[R]egulations" relates to the operation of through routes. §201(a). "[C]lassifications" refers to different sorts of communications that carry different charges. §201(b). These three terms involve either setting rules for the provision of service or setting rates for that provision. In keeping with the meaning of these terms, the term "practices" must refer to only those practices "in connection with the fixing of rates to be charged and prescribing of service to be rendered by the carriers." *Norwood, supra,* at 257.

The statutory provisions surrounding §201 confirm this interpretation. Section 203 requires that "[e]very common carrier . . . shall . . . file with the Commission . . . schedules showing all charges for itself and its connecting carriers . . . and showing the classifications, practices, and regulations affecting such charges." See also §§204–205 (also using the phrase "charge, classification, regulation, or practice" in the tariff context). The "charges" referred to are those related to a carrier's own services. §203

("charges for itself and its connecting carriers"). The "classifications, practices, and regulations" are also limited to a carrier's own services. *Ibid.* (applying only to practices "affecting such charges"). In this context, "practices" must mean only those "in connection with the fixing of rates to be charged." *Norwood*, 283 U. S., at 257. Section 202—outside of the tariff context—also supports this limitation. It forbids discrimination "in charges, practices, classifications, regulations, facilities, or services." Discrimination occurs with respect to a carrier's provision of service—not its purchasing of services from others. I am unaware of any context in which §§202–205 were applied to conduct relating to the service that another party provided to a telecommunications carrier.

In this case, Global Crossing has not provided any service to Metrophones. Rather, Global Crossing has failed to pay for a service that Metrophones supplied. The failure to pay a supplier is not in any sense a "'practice' in connection with the fixing of rates to be charged and prescribing of service to be rendered by the carriers." *Id.,* at 257. Accordingly, Global Crossing has not engaged in a practice under subsection (b) because the failure to pay has not come in connection with its provision of service or setting of rates within the meaning of subsection (a). On this understanding of §201, Global Crossing's failure to pay Metrophones is not a statutory violation. All that remains is a regulatory violation, which does not provide Metrophones a private right of action under §207.[1]

_____

[1] Other enforcement mechanisms exist to redress Global Crossing's failure to pay. The Federal Communications Commission (FCC) has the power to impose fines under 47 U. S. C. §§503(b)(1)(B) and (2)(B). In addition, the FCC may have the authority to create an administrative right of action under §276(b)(1) (giving the FCC power to "take all actions necessary" to "establish a per call compensation plan" that ensures "all payphone service providers are fairly compensated").

## II

The majority suggests that deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984), compels its conclusion that a carrier's refusal to pay a payphone operator is unreasonable. But "unjust or unreasonable" is a statutory term, §201(b), and a court may not, in the name of deference, abdicate its responsibility to interpret a statute. Under *Chevron*, an agency is due no deference until the court analyzes the statute and determines that Congress did not speak directly to the issue under consideration:

> "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. . . . If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.,* at 843, n. 9.

The majority spends one short paragraph analyzing the relevant provisions of the Communications Act to determine whether a refusal to pay is an "'unjust or unreasonable'" "'practice.'" *Ante*, at 7. Its entire statutory analysis is essentially encompassed in a single sentence in that paragraph: "That is to say, in ordinary English, one can call a refusal to pay Commission-ordered compensation despite having received a benefit from the payphone operator a 'practice . . . in connection with [furnishing a] communication service . . . that is . . . unreasonable.'" *Ibid.* (omissions and modifications in original). This analysis ignores the interaction between §201(a) and §201(b), *supra,* at 1–2; it ignores the three terms surrounding the word "practice" and the context those terms provide, *supra,* at 3–4; it ignores the use of the term "practice" in nearby statutory provisions, such as §§202–205,

*supra,* at 4; and it ignores the understanding of the term "practice" at the time Congress enacted the Communications Act, *supra,* at 2–3.

After breezing by the text of the statutory provisions at issue, the majority cites lower court cases to claim that "the underlying regulated activity at issue here *resembles* activity that both transportation and communications agencies have long regulated." *Ante*, at 7–8 (citing *Allnet Communication Serv., Inc.* v. *National Exch. Carrier Assn., Inc.*, 965 F. 2d 1118 (CADC 1992), and *Southwestern Bell Tel. Co.* v. *Allnet Communications Serv., Inc.,* 789 F. Supp. 302 (ED Mo. 1992)). It argues that these cases demonstrate that "communications firms entitled to revenues under rate divisions or cost allocations might bring lawsuits under §207 . . . and obtain compensation or damages." *Ante*, at 8. But in both cases, the only issue before the court was whether the lawsuit should be dismissed because the FCC had primary jurisdiction; and in both cases, the answer was yes. *Allnet*, *supra*, at 1120–1123; *Southwestern Bell*, *supra*, at 304–306. The Court's reliance on these cases is thus entirely misplaced because both courts found they lacked jurisdiction; the cases do not address §201 at all—the interpretation of which is the sole question in this case; and both cases assume without deciding that §207 applies, thus not grappling with the point for which the majority claims their support.[2]

## III

Finally, independent of the FCC's interpretation of the

---

[2] The majority's citation to *Chicago & North Western Transp. Co.* v. *Atchison*, *T. & S. F. R. Co.,* 609 F. 2d 1221 (CA7 1979), is similarly misplaced. There, the Court of Appeals interpreted the meaning of the statutory requirement to "'establish just, reasonable, and equitable divisions'" under the Interstate Commerce Act. *Id.,* at 1224. It is difficult to understand why the Seventh Circuit's interpretation of different statutory language is relevant to the question we face in this case.

language "unjust or unreasonable" "practice," the FCC's interpretation is unreasonable because it regulates both interstate and intrastate calls. The unjust-and-unreasonable requirement of §201(b) applies only to "practices . . . in connection with such communication service," and the term "such communication service" refers to "*interstate* or foreign communication by wire or radio" in §201(a) (emphasis added). Disregarding this limitation, the FCC has applied its rule to both interstate and intrastate calls. 47 CFR §64.1300 (2005). In light of the fact that the statute explicitly limits "unjust or unreasonable" "practices" to those involving "interstate or foreign communication," the FCC's application of §201(b) to intrastate calls is plainly an unreasonable interpretation of the statute. To make matters worse, the FCC has not even bothered to explain its clear misinterpretation. See *In re Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 18 FCC Rcd. 19975 (2003).

The majority avoids directly addressing this argument by stating there is no reason "to forbid the FCC from concluding that an interstate half loaf is better than none." *Ante*, at 13. But if the FCC's rule is unreasonable, Metrophones should not be able to recover for intrastate calls in a suit under §207. Because intrastate calls cannot be the subject of an "unjust or unreasonable" practice under §201, there is no private right of action to recover for them, and the Court should cut off that half of the loaf. By sidestepping this issue, the majority gives the lower court no guidance about how to handle intrastate calls on remand.

## IV

Because the majority allows the FCC to interpret the Communications Act in a way that contradicts the unambiguous text, I respectfully dissent.